No. 05-426

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 48

_____

BITTERROOT INTERNATIONAL SYSTEMS, LTD.,

        Plaintiff and Respondent,

   v.

WESTERN STAR TRUCKS, INC.,

        Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula, Cause No. DV-98-86255,
The Honorable John W. Larson, Presiding Judge.

COUNSEL OF RECORD:

        For Appellant:

            Robert J. Phillips and Amy O. Duerk, Phillips & Bohyer, P.C., Missoula,
            Montana

        For Respondent:

            Patrick G. Frank, Worden Thane, P.C., Missoula, Montana

_____

Submitted on Briefs:  November 22, 2006

Decided:  February 21, 2007

Filed:

_____
                Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Plaintiff Bitterroot International Systems, LTD (Bitterroot) brought an action against Western Star Trucks, Inc. (Western) in the Fourth Judicial District Court, Missoula County, alleging breach of contract and breach of the covenant of good faith and fair dealing. The jury returned a verdict in Bitterroot's favor on all claims. It awarded Bitterroot $2,311,575 in damages. Western appeals.

¶2 We review the following issues on appeal:

¶3 Was the District Court's decision to exercise personal jurisdiction over Western Star Trucks, Inc. correct?

¶4 Did the District Court correctly determine that a five-year, written contract existed between the parties?

¶5 Did the District Court abuse its discretion by denying Western Star Trucks, Inc. leave to amend its answer to assert the statute of frauds defense?

¶6 Did the District Court abuse its discretion by instructing the jury regarding the "lost volume seller" theory of damages?

**FACTUAL AND PROCEDURAL HISTORY**

¶7 Bitterroot provides freight hauling services between the United States and Canada. Bitterroot is a Canadian corporation based in Missoula, and registered to conduct business in Montana. Western manufactures custom-built trucks and truck parts with its principal place of business in Kelowna, British Columbia. Western also is a Canadian corporation, but it is not registered to conduct business in Montana. Western contracted with Bitterroot, starting in the mid-1980s and continuing through the mid-1990s, to

deliver freight from various locations around the United States to Western's headquarters in Kelowna, Canada.

¶8     Bitterroot proposed to Western in 1995 that Bitterroot perform transportation logistics services in addition to the freight hauling services that it previously had provided to Western.  Bitterroot alleges that it submitted a written "Transportation Logistics Proposal" to Western that contained, among other things, a proposed contract term of five years, a plan to place a Bitterroot logistics employee at Western's headquarters, proposed hauling rates, and a performance evaluation method called a "report card."

¶9     Western and Bitterroot signed a letter that had been written by Western, dated April 25, 1996 (April 25 letter).  Bitterroot alleges that the letter represented a contract between Western and Bitterroot to perform the logistics services that Bitterroot had proposed to Western in the 1995 "Transportation Logistics Proposal." The April 25 letter referenced Bitterroot's "Transportation Logistics Proposal," but also contained a number of terms not contained in Bitterroot's original logistics proposal. One of the new terms included a provision that allowed for either party to terminate the "agreement" with 120-days notice.

¶10     Bitterroot began to implement the "Transportation Logistics Proposal" pursuant to the terms of the April 25 letter, while both parties continued to negotiate the "details" of the agreement.  Bitterroot's actions in reliance on the April 25 letter included hiring, training, and placing a logistics employee at Western Star's facility in Canada and also installing computer equipment, telephone lines and a "data line," in order to provide

Western with logistics services.

¶11 Western started to have second thoughts about its agreement with Bitterroot sometime around June of 1996. Western began to discuss logistics services with Logistics, Inc. (Logix), a competitor of Western. Logix, after reviewing Bitterroot's "proposal," "strongly recommend[ed to Western] that no further action be taken on [Bitterroot's proposal]." Western signed a formal agreement with Logix on April 13, 1997, for Logix to provide Western's logistics services.

¶12 Logix immediately sent a letter to Bitterroot stating that "effective 4/15/1997 Logix has contracted with Western . . . to manage all transportation and logistics issues." Bitterroot in turn notified Logix on April 21, 1997, that Western and Bitterroot were operating under a "binding letter of intent" and that "[a]ny arrangement that Logix has with Western Star will have to encompass this agreement."

¶13 Western then sent a letter to Bitterroot on June 11, 1997, stating that Bitterroot and Western "have been unable to conclude the details" referenced in the April 25 letter, and "[t]herefore Western Star is exercising the 120 day notice of termination, pursuant to the [April 25 letter], to terminate the relationship between Bitterroot and Western Star effective on October 17, 1997."

¶14 Bitterroot objected in writing to Western's June 11, 1997 letter, requesting that "Western Star reconsider its position taken in your June 11, 1997 correspondence and recognized the obligations . . . that arose at the time the April 25, 1996 letter of understanding was entered into." Western continued to communicate with Bitterroot in order to "finalize the details prior to the October 17, 1997 [t]ermination date."

4

¶15 Bitterroot and Western negotiated past the October 17, 1997, termination date. Bitterroot's and Western's negotiations halted completely, however, on January 14, 1998, when Western informed Bitterroot that all of Western's logistics service would be handled exclusively by Logix, including the decision of whether Western would continue to use Bitterroot as a carrier. Bitterroot notified Western in February of 1998 that it was "terminat[ing] all of its ongoing services to Western Star effective February 24, 1998 . . . in light of Western Star's refusal to honor its contractual obligations to Bitterroot . . . ."

¶16 Bitterroot filed a complaint against Western in district court on March 13, 1998, alleging breach of contract and breach of the covenant of good faith and fair dealing. Western filed a motion to dismiss on April 20, 1998, pursuant to M. R. Civ. P. 12(b)(2) and (6), respectively. Western alleged that the court did not have personal jurisdiction over Western and that Bitterroot had failed to state a claim upon which relief could be granted. The court ruled on September 2, 1999, that "the facts averred in the record indicate that both parties are transacting business in Montana." The court also noted, however, that Bitterroot was not registered to do business in Montana. The court ordered that Bitterroot could not maintain a proceeding in the courts of Montana pursuant to § 35-1-1027, MCA. The court stayed the action until Bitterroot filed proof of a certificate of authority to do business in Montana.

¶17 Bitterroot filed proof that it was properly registered to conduct business in Montana. The court then denied Western's motion to dismiss. The court cited the "contacts outlined in" its September 2, 1999, order that had stayed the proceedings pending proof of Bitterroot's registration to conduct business in Montana.

5

¶18 Bitterroot amended its complaint on June 8, 2000, to include a claim against Logix for tortious interference with business relations. Bitterroot and Logix settled the claim, and the matter proceeded on Bitterroot's claims against Western.

¶19 Western moved for summary judgment on September 25, 2001, arguing that Bitterroot's claims must fail because no binding contract existed between the parties. The court denied the motion on the grounds that the evidence showed that "an agreement existed." The court concluded that "[a]s Western Star Trucks' actions as well as its internal documents confirm the existence of an agreement between the parties for freight hauling at a set rate per mile over a five-year term, this Court finds sufficient evidence of an agreement between the parties, and a dispute as to material facts which prevents granting summary judgment to Western Star Trucks."

¶20 The District Court held a trial from May 20 through May 25, 2005. The court instructed the jury that "a contract was formed between the parties on April 25, 1996." The court submitted issues of breach and damages to the jury. The jury returned a verdict in favor of Bitterroot. The jury found that Western had breached the contract and the covenant of good faith and fair dealing. The jury awarded Bitterroot $2,311,575 in damages. This appeal followed.

## DISCUSSION

### ISSUE ONE

¶21 *Was the District Court's decision to exercise personal jurisdiction over Western Star Trucks, Inc. correct?*

¶22 The District Court determined that it had specific personal jurisdiction over

6

Western based on the fact that Western was "transacting business within Montana." Western argues that the District Court had no basis to exercise specific personal jurisdiction over Western because Western is "a Canadian corporation which lacks sufficient minimum contacts with Montana."

¶23 We review a district court's conclusion of law regarding personal jurisdiction to determine if it is correct. *Gulf. Ins. Co. v. Clark*, 2003 MT 87, ¶ 11, 315 Mont. 121, ¶ 11, 68 P.3d 673, ¶ 11. We review related findings of fact to determine whether the findings are clearly erroneous. *Gulf. Ins. Co.*, ¶ 11.

¶24 We conduct a two-step inquiry in order to determine whether a court can exercise personal jurisdiction over a non-resident defendant. *Boyd v. United Die And Manufacturing Co.*, 2004 MT 286, ¶ 16, 323 Mont. 308, ¶ 16, 100 P.3d 127, ¶ 16. We determine first whether personal jurisdiction exists pursuant to M. R. Civ. P. 4B(1). *Boyd*, ¶ 16. We determine second whether jurisdiction conforms with the traditional notions of fair play and substantial justice embodied in the Due Process Clause of the United States Constitution. *Boyd*, ¶ 16.

¶25 Specific jurisdiction is established if the plaintiff's cause of action arises from any of the defendant's activities that are enumerated in M. R. Civ. P. 4B(1), including "(a) the transaction of any business within this state . . . ." M. R. Civ. P. 4B(1)(a). The record indicates that Western transacted business in Montana, with a Montana based company, and a dispute arose out of those business transactions.

¶26 Western denies that Bitterroot and Western entered into a contract for transportation logistics in April of 1996, but Western does not dispute that Bitterroot

performed a number of business activities in Montana pursuant to an informal agreement between Western and Bitterroot that began in April of 1996. Western, for example, does not challenge the fact that Bitterroot's employees, who were located in Missoula, performed a significant portion of the obligations required of Bitterroot pursuant to the terms of the April 25 letter. Western also does not challenge the fact that Bitterroot located one of its own employees, paid out of Bitterroot's office in Missoula, to Western's headquarters in Kelowna, British Columbia to perform obligations under the April 25 letter. Western agrees that Western and Bitterroot communicated on a daily basis by telephone, fax, and through a "data line" between Kelowna and Missoula that was used to provide services described in the "Transportation Logistics Proposal." Western also does not dispute that Western made various payments to Bitterroot in Missoula. These facts are sufficient for the District Court to assert specific personal jurisdiction over Western pursuant to M. R. Civ. P. 4B(1)(a). *Boyd*, ¶ 16.

¶27 We next determine whether the District Court's exercise of jurisdiction comports with the traditional notions of fair play and substantial justice embodied in the Due Process Clause. *Boyd*, ¶ 32. We presume jurisdiction is reasonable pursuant to the Due Process Clause once the plaintiff establishes that the defendant has purposefully availed itself of the privilege of conducting business in the forum. *Boyd*, ¶ 34. We determine that a nonresident defendant has purposely availed itself of the forum when it "takes voluntary action designed to have an effect in the forum" as opposed to contacts with the forum that are "random, fortuitous, attenuated, or due to the unilateral activity of a third party." *Boyd*, ¶ 35.

¶28 Western purposely availed itself of the privileges of conducting business in Montana by (1) hiring Bitterroot—a Montana-based company—to haul its freight and perform logistics services, (2) making payments to Bitterroot in Missoula, (3) hosting a Bitterroot employee at Western's headquarters who was paid by Bitterroot out of Missoula, and (4) communicating daily to and from Bitterroot's headquarters in Missoula via telephone, fax, and the specially installed "data line," pursuant to the April 25 letter. *Boyd*, ¶ 35.

¶29 Western's present dispute with Bitterroot arose out of these activities. Western presents no compelling argument that the District Court's exercise of jurisdiction was unreasonable. We presume that personal jurisdiction over Western is reasonable and conclude that the District Court's exercise of specific personal jurisdiction over Western does not offend traditional notions of fair play and substantial justice as embodied in the Due Process Clause. *Boyd*, ¶ 35.

## ISSUE TWO

¶30 *Did the District Court correctly determine that a five-year, written contract existed between the parties?*

¶31 The court concluded in its October 2003 summary judgment order that "Western Star Truck's actions as well as its internal documents confirm the existence of an agreement between the parties for freight hauling at a set rate per mile over a five year term . . . ." Western alleges that the District Court erred in determining that a contract existed between the parties. Western argues that the parties did not mutually consent to the material terms of the alleged contract.

9

¶32    We review a district court's decision to grant summary judgment *de novo*, using the same criteria applied by the district court under M. R. Civ. P. 56. *GRB Farm v. Christman Ranch, Inc.*, 2005 MT 59, ¶ 7, 326 Mont. 236, ¶ 7, 108 P.3d 507, ¶ 7. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c). We draw all reasonable inferences in favor of the party opposing summary judgment. *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 16, 321 Mont. 432, ¶ 16, 92 P.3d 620, ¶ 16.

¶33    Mutual consent consists of an offer and an acceptance of that offer. *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 133, 804 P.2d 359, 363 (1990). We determine whether the parties have mutually consented to a contract by inquiring whether a reasonable person, based upon the objective manifestation of assent, and all the surrounding circumstances, would conclude that the parties intended to be bound by the contract. Sections 28-2-501, 503, MCA; *Lopez v. Charles Schwab & Co., Inc.*, 118 Cal.App.4th 1224, 1229-30, 13 Cal.Rptr.3d 544, 548 (Cal.App. 1 Dist. 2004). We determine whether mutual consent exists based on the consent that the parties express through their words and the consent that the parties imply through their conduct. *Weinberg v. Farmers State Bank of Worden*, 231 Mont. 10, 25, 752 P.2d 719, 728-29 (1988); Sections 28-2-103, 501, 503, MCA; Restatement (Second) of Contracts §§ 4, 19.

¶34    Our review of the record on summary judgment indicates that there is no genuine issue of material fact with regard to whether Western objectively manifested its intent to

10

be bound to a contract with a five-year term and a set rate per mile on April 25, 1996.

Western does not dispute that it wrote and signed the following letter:

> Date: April 25, 1996
> Dear Stan:
>
> This letter is your confirmation of acceptance by Western Star Trucks, in concept, of your Transportation Logistics Proposal.
>
> This also serves you notice to begin the procedure of obtaining a Logistics person and equipment required to perform the various functions required for this position.
>
> The process within Western Star of an office realignment will also begin with your acceptance of these general terms: inclusive of the rates and terms in existence today. *"including terms or limits"* [hand written by Stan Spencer, either before or after he signed below]
>
> Both Bitterroot and Western Star have a great deal at stake in our future work relationship, with this I can confidently say that I see no reason why we would not be able to finalize the details of this proposal. Should this not be the case, a 120 day notice in writing is required by either party to terminate this agreement.
>
> These details include rates, report card, and a job description for the Logistics person. Other minor items will include such things as, holiday relief, legal liabilities, decision making limitations, etc.
>
> Should this meet with your approval we would like to begin implementing this immediately, as Western Star would desire a start date of June 1, 1996.
>
> THANKING YOU IN ADVANCE
>
> [signed] Paul Perreault               [signed] Stan Spencer
> [Western Star] Traffic Specialist     Bitterroot Acceptance

Western admits that this document could be construed as an offer, but argues that the April 25 letter did not contemplate a five-year term or a rate schedule. Western does not point to any evidence, however, that refutes Bitterroot's deposition testimony that the parties understood that the term "Transportation Logistics Proposal" referred to a

11

document that contained a five-year term and a rate schedule. Western, in fact, makes various admissions supporting Bitterroot's testimony.

¶35 Western admitted that it had received a "Transportation Logistics Proposal" from Bitterroot that contained a five-year term and set rates. Western also admitted that the April 25 letter "expressly accepts 'in concept' the unsolicited Transportation Logistics Proposals provided by Bitterroot to Western Star . . . ." Western's own internal documents referenced the five-year term of the "agreement" and cited the same rates per mile contained in the "Transportation Logistics Proposal." Western also admits in a March 7, 1996, internal document, entitled "Bitterroot Logistics Proposal," that the "[c]ontract will be for a five (5) year term. (As per rate schedule)."

¶36 We also find no genuine issue of material fact as to whether Bitterroot objectively manifested its intent to assent to the offer represented by Western's April 25 letter. Bitterroot presented evidence that it took the following actions in response to Western's April 25 letter: Bitterroot (1) signed the April 25 letter; (2) installed computer and telecommunications equipment, including a "data line;" (3) hired, trained, and placed a full-time logistics employee at Western's headquarters; and (4) hauled freight according to the terms and rates contained in the "Transportation Logistics Proposal" for approximately two years after it had received the April 25 letter until Western cancelled the agreement. Western submitted no evidence to the contrary.

¶37 Western argues in the alternative that its April 25 letter was ambiguous in light of the fact that the record contains two possible drafts of the "Transportation Logistics Proposal:" (1) the logistics proposal referenced in Bitterroot's complaint ("final draft

12

logistics proposal") that includes the five-year term and the rate schedule and (2) an earlier draft of the logistics proposal ("initial draft logistics proposal") that does not contain the five-year term or the rate schedule. Western asserts that no evidence in the record confirms that it ever had received the final draft logistics proposal, or that the final draft logistics proposal had been written by the time Western wrote the April 25 letter.

¶38 We first clarify the procedural context in which Western makes its argument. Western moved for summary judgment in September of 2001 on the grounds that no contract existed between the parties. The court denied Western's motion for summary judgment in October 2003, determining that there was "sufficient evidence of an agreement between the parties, and a dispute as to material facts which prevents granting summary judgment to Western Star Trucks." The court also appears to have granted partial summary judgment to Bitterroot, however, on the issue of contract formation. The court determined that "Western Star Trucks' actions as well as its internal documents confirm the existence of an agreement between the parties for freight hauling at a set rate per mile over a five-year term . . . ." Although Bitterroot had not filed a cross-motion for partial summary judgment, a party need not file a formal cross-motion for summary judgment in order for a court to enter summary judgment in the non-moving party's favor where it is apparent that no genuine issues of material fact exist. *In re Estate of Marson*, 2005 MT 222, ¶ 9, 328 Mont. 348, ¶ 9, 120 P.3d 382, ¶ 9.

¶39 Western again raised the contract formation issue two years later at pretrial hearings on May 19 and 20, 2005 (pretrial hearings). Western argued at the pretrial hearings that the court should allow Western to argue to the jury that the term

13

"Transportation Logistics Proposal" referenced the initial draft proposal and that no evidence demonstrated that Western had possessed the final draft proposal at the time that Western wrote the April 25 letter. The court determined that it would not allow evidence of the initial draft proposal to be presented to the jury. The court reminded Western's counsel that the court had determined in its summary judgment order of October 7, 2003, that "a contract was found to exist" and that the final draft logistics proposal was the controlling document.

¶40 We normally would review *de novo* the court's decision in the pretrial hearings to deny Western's motion for partial summary judgment on the existence of a contract between the parties. *GRB Farm,* ¶ 7. We need not review the court's action here, however, as a denial of Western's motion for summary judgment. We conclude that the court could have denied Western's motion under the theory of judicial admission in light of the fact that Western's argument at the pretrial hearings directly contradicted the facts that it had admitted in the 2001 summary judgment proceedings.

¶41 A judicial admission is an express waiver made in court by a party or its counsel conceding the truth of an alleged fact. *In re Raymond W. George Trust*, 1999 MT 223, ¶ 36, 296 Mont. 56, ¶ 36, 986 P.2d 427, ¶ 36. A judicial admission has a conclusive effect upon the party who makes it, and prevents that party from introducing further evidence to prove, disprove, or contradict the admitted fact. *In re Raymond W. George Trust*, ¶ 36.

¶42 Western admitted in its briefs supporting its 2001 motion for summary judgment that (1) it was aware of both drafts of the "Transportation Logistics Proposals;" (2) it was aware that the April 25 letter might refer to both of the "Transportation Logistics

14

Proposals;" and (3) that it had received the initial draft proposal, and later, "a nearly identical" final draft proposal. Western also admitted that the April 25 letter "expressly accepts 'in concept' the unsolicited Transportation Logistics Proposals provided by Bitterroot to Western Star . . . ." Western further clarified in a footnote that when it said, "Transportation Logistics Proposals," it was referring to both the initial draft logistics proposal and the final draft logistics proposal. Western's admissions are confirmed by the District Court's statement in its 2003 summary judgment order that Western and Bitterroot did not contest that "Bitterroot forwarded a proposal to Western Star Trucks to provide logistics services in May, 1995, which included the statement 'Contract will be for a five (5) year term.'"

¶43   Western's admissions in the 2001 summary judgment proceedings directly contradict its arguments on appeal, and at the pre-trial hearings, that there was no evidence that it ever had received the final draft logistics proposal and that the April 25 letter referred only to the initial draft proposal. Western admitted that it had received the final draft proposal and that the April 25 letter referred, at the very least, to both drafts of the proposal. We may uphold a district court that reached the right result even if for the wrong reason. *Pumphrey v. Empire Lath and Plaster*, 2006 MT 99, ¶ 37, 332 Mont. 116, ¶ 37, 135 P.3d 797, ¶ 37. We uphold the District Court's decision to deny Western's motion to enter evidence of contract formation at trial on the grounds that Western's earlier judicial admissions precluded it. *In re Raymond W. George Trust*, ¶ 36.

¶44   Western argues next that the parties failed to mutually assent to the material term of freight hauling rates. Western admits that the April 25 letter "explicitly incorporates

15

the freight hauling rates in existence in April 1996 . . . ."  Western also does not contest that it reimbursed Bitterroot according to the rates contained in the final draft logistics proposal for almost two years after the parties had signed the April 25 letter.  Western argues, however, that the April 25 letter anticipated further negotiations on these "rates."  Western asserts that the "further negotiations provision" makes these rates merely an unenforceable "agreement to agree."

¶45    We agree with Western that the clause in the April 25 letter that requires the parties to negotiate rates at a later date is not, on its face, an enforceable clause.  *GRB*, ¶¶ 11-14 (holding that an agreement to agree is unenforceable).  This unenforceable clause to further negotiate rates, however, does not change the fact that the parties mutually assented to the rate schedule contained in the final draft logistics proposal as evidenced by the fact that Western paid Bitterroot for its services according to the rate schedule provided in the final draft logistics proposal.  The April 25 letter, by its express terms, and by the surrounding conduct of parties, represents a meeting of the minds with respect to all material terms.  *GRB Farm*, ¶ 7.

## ISSUE THREE

¶46    *Did the District Court abuse its discretion by denying Western Star Trucks, Inc. leave to amend its answer to assert the statute of frauds defense?*

¶47    Western argues that the District Court should have granted Western's motion to amend its answer to include a defense of statute of frauds.  The District Court denied the motion to amend because Western had "effectively waive[d] its right to plead statute of frauds under [M. R. Civ. P. 8(c)]" and also had "waited until discovery was complete,

16

less than [three] months before trial to request leave to amend . . . ."

¶48    The decision to grant or deny a motion to amend lies within the discretion of the district court. *Lindey's  v. Professional Consultants*, 244 Mont. 238, 242, 797 P.2d 920, 923 (1990).  We review the district court's decision to amend for an abuse of discretion. *Lindey's*, 244 Mont. at 242, 797 P.2d at 923.

¶49    Montana Rule of Civil Procedure 8(c) provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of frauds . . . and any other matter constituting an avoidance or affirmative defense."  Rule 8(c) derives from "the same principles of fairness and notice which require a plaintiff to set forth the basis of the [plaintiff's claim] . . . ." *Brown v. Ehlert*, 255 Mont. 140, 146, 841 P.2d 510, 514 (1992). Rule 8(c) is not absolute, however, as the court retains discretion to allow a defendant to amend pursuant to the terms of M. R. Civ. P. 15 as determined by our holding in *Keller v. Dooling*, 248 Mont. 535, 542, 813 P.2d 437, 441 (1991).

¶50    Montana Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires."  Rule 15(a) favors allowing amendments, but a "trial court is justified in denying a motion for an apparent reason 'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by allowance of the amendment, futility of the amendment, etc.'" *Lindey's*, 244 Mont. 238, 242, 797 P.2d 920, 923 (1990).

¶51    Western moved to amend its answer with an affirmative defense of statute of frauds in February of 2005.  Bitterroot had filed its amended complaint in June of 2000,

17

and the trial began in May of 2005. Western delayed placing Bitterroot on notice of Western's statute of frauds defense until three months before trial—almost five-years after Bitterroot had filed its amended complaint.

¶52 Bitterroot argues that Western's belated attempt to amend its answer would have prejudiced Bitterroot's case because discovery already had closed. Bitterroot contends that the delay would have deprived it of the opportunity to seek discovery of admissions, documents, and witness testimony to establish the defenses to statute of frauds, including sufficiency of writings, part performance, and estoppel. Western asserts that Bitterroot had all the evidence necessary, and in any event, Western "was willing to reopen discovery if necessary." Bitterroot responded that it already had deposed key witnesses in Canada at great expense and was reluctant to repeat the process.

¶53 Western points to "an oversight by Western Star's attorneys" as the sole justification for its delay in asserting its affirmative defense. Western attempts to minimize this "oversight" by arguing that the statute of frauds defense came as "no surprise to Bitterroot" because "[t]he existence or non-existence of a written contract was always a central issue in this case." Western's counsel fails to explain adequately, however, how such an obvious defense escaped its attention for nearly five years.

¶54 The District Court acted within its discretion in denying Western's motion to amend. The District Court reasonably could have decided that Western's belated amendment would have prejudiced Bitterroot's case, and Western failed to offer any meaningful justification for its delay. Moreover, we would render Rule 8(c)'s purpose of providing adequate notice of affirmative defenses to the plaintiff a nullity if we were to

18

allow Western to amend under these circumstances.

## ISSUE FOUR

¶55 *Did the District Court abuse its discretion by instructing the jury regarding the "lost volume seller" theory of damages?*

¶56 Western argues that the District Court erroneously instructed the jury to consider the "lost volume seller" theory. We review a trial court's jury instructions for an abuse of discretion. *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 9, 316 Mont. 469, ¶ 9, 74 P.3d 1021, ¶ 9. The party assigning error to a district court's jury instruction must show prejudice in order to prevail, and prejudice will not be found if the jury instructions in their entirety state the applicable law of the case. *Christofferson,* ¶ 9.

¶57 Western proposed in pretrial proceedings that the court submit to the jury an instruction on the duty to mitigate. Bitterroot responded that "mitigation is not an issue and should have been pled as an affirmative defense by [Western] in its answer." Bitterroot argued that if the court allowed an instruction on the duty to mitigate, then Bitterroot would request an instruction on lost volume seller theory. The District Court agreed and first instructed the jury on the duty to mitigate: "[t]he Plaintiff has a duty to minimize their damages. However, that duty does not require them to do what is unreasonable or impracticable." The Court also instructed the jury on lost volume seller theory:

> As to damages claims after February 24, 1998 if you find: (1) the seller of services possessed the capability to perform additional contracts simultaneously, (2) the additional contracts would have been profitable, and (3) the seller of services probably would have entered into the additional contracts even if the first contract had not terminated [, all] to be established by a preponderance of the evidence, then the gains, which were

19

or could have been received by the non defaulting party by entering into another contract or transaction (mitigation) should not be used in reducing damages caused by a breach of contract.

¶58 Western argues that the lost volume seller theory represents an "incorrect statement of law." The lost volume seller theory arises from the Uniform Commercial Code § 2-708(2), regarding the sale of goods. Western concedes that Montana has incorporated the lost volume seller theory as part of § 30-2-708(2), MCA, but argues against its application in this case for three reasons. First, Western contends that this Court has yet to address § 30-2-708(2), MCA, or adopt the lost volume seller theory of damages. Second, Western claims that the lost volume seller theory, in general, and § 30-2-708(2), MCA, in particular, relate to the sale of goods rather than services as provided by Bitterroot in this case. Finally, Western argues that even if the lost volume seller theory applies to the provision of services, Bitterroot failed to establish the required elements. Bitterroot admits that this Court has not considered the lost volume seller theory with respect to the provision of services, but suggests that we should join other jurisdictions in adopting the theory as described in the Restatement (Second) of Contracts.

¶59 The term "lost volume seller" originates from an article written by Professor Robert J. Harris entitled, *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared*, 18 Stan. L. Rev. 66 (1965); *see also Famous Knitwear Corporation v. Drug Fair, Inc.*, 493 F.2d 251, 254 n. 5 (4th Cir. 1974); *Snyder v. Herbert Greenbaum & Assoc. Inc.*, 380 A.2d 618, 624 n. 3 (Md. App. 1977). The lost volume seller theory allows a jury to consider the fact that an injured party,

under certain circumstances, may not be made whole if its subsequent contracts diminish its losses.

¶60   As described in Restatement (Second) of Contracts § 350 cmt. d (1981), "[t]he mere fact that an injured party can make arrangements for the disposition of the goods *or services* that he was to supply under the contract does not necessarily mean that by doing so he will avoid loss."  (Emphasis added).  The Restatement explains that if an injured party would have been able to enter both into the breached contract and a subsequent contract, then the subsequent contract is not a substitute for the breached contract, and the breached contract represents "lost volume."  Restatement (Second) of Contracts § 350 cmt. d (1981);  Restatement (Second) of Contracts § 347 cmt. f (1981).

¶61   Courts that have adopted the Restatement's lost volume seller theory have followed Professor Harris's suggested test to determine whether a party qualifies as a lost volume seller: the injured party must prove (1) that it possessed the capacity to make additional sales, (2) that it would have been profitable to make additional sales, and (3) that it probably would have made additional sales absent the buyer's breach.  *See e.g., Gianetti v. Norwalk Hosp.*, 833 A.2d 891, 898 (Conn. 2003); *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 685 (7th Cir. 1987); *Rodriguez v. Learjet, Inc.*, 946 P.2d 1010, 1014-15 (Kan. App. 1997); 22 Am. Jur. 2d Damages § 356; Restatement (Second) of Contracts § 350 illus. 10 (1981).  This test captures the concept that an injured party sometimes could and would enter into a subsequent contract.

¶62   Western argues that the lost volume seller theory departs from the traditional duty to mitigate damages in breach of contract claims.  We have adopted the traditional

requirement that an injured party cannot recover damages for breach of contract that the injured party reasonably could have avoided by entering into a subsequent contract. *Bronken's Good Time Co. v. J.W. Brown*, 203 Mont. 427, 432-33, 661 P.2d 861, 864 (1983). Whether an injured party violated its duty to mitigate damages presents "a question for the trier of fact when there is conflicting evidence." *Bronken's*, 203 Mont. at 433, 661 P.2d at 864. The lost volume seller theory found in the Restatement, and codified at § 30-2-708(2), MCA, provides only a limited exception to this traditional rule.

¶63 This exception in no way undermines the requirement that an injured party must attempt to mitigate its damages in breach of contract claims. *Gierke v. Walker*, 279 Mont. 349, 354, 927 P.2d 524, 527 (1996). Instead the Restatement allows a party to keep the monetary benefits of a breached contract, undiminished by the doctrine of mitigation of damages, if the party could have and would have entered into a second contract simultaneously with the breached contract. Restatement (Second) of Contracts § 347 cmt. f; *Gianetti*, 833 A.2d at 896-97. In this regard, we note that the District Court also instructed the jury on Bitterroot's duty to mitigate its losses. The court left it to the jury to decide whether Bitterroot's duty to mitigate its losses reduced its damages, or whether, in the alternative, Bitterroot qualified as a lost volume seller, thereby making Bitterroot eligible for an award of lost volume sales.

¶64 We agree with the reasoning underlying the lost volume seller theory as described in the Restatement (Second) of Contracts § 350 cmt. d and § 347 cmt. f. This reasoning comports with the Legislature's incorporation of the theory in § 30-2-708(2), MCA, for the sale of goods. Moreover, awarding lost profits to a lost volume seller serves the

22

general principle of awarding damages to make a party whole by restoring the nonbreaching party to the position that party had occupied before the breach. In other words, we award compensatory damages to place a seller in as good a position as if a buyer had performed. *See Billings Clinic v. Peat Marwick Main*, 244 Mont. 324, 345, 797 P.2d 899, 913 (1990). We now join other jurisdictions in adopting the lost volume seller theory of damages. *See e.g. Gianetti*, 833 A.2d at 898; *Jetz Service Co. v. Salina Properties*, 865 P.2d 1051 (Kan. 1993); *Wired Music, Inc. v. Clark*, 168 N.E.2d 736 (Ill.App.2d. 1960); *R.E. Davis Chemical Corp.*, 826 F.2d at 681 & n. 2 (7th Cir. 1987); *see* 1 White & Summers, Uniform Commercial Code §§ 7-9, p. 385 n. 4 (4th ed. 1995) (listing cases that have applied § 2-708(2) to lost volume sellers). The District Court's lost volume seller instruction to the jury represented a correct statement of law, and, therefore, did not unfairly prejudice Western. *Christofferson,* ¶ 9.

¶65 Western argues in the alternative that the lost volume seller theory of damages arises from the Uniform Commercial Code and, therefore, the theory applies only to contracts for the sale of goods. Western contends that the theory has no application here where Bitterroot provided freight hauling and logistics services, rather than goods. Western misplaces its reliance on the Uniform Commercial Code, however, as we have adopted the lost volume seller theory that arises out of the Restatement (Second) of Contracts § 350 cmt. d and § 347 cmt. f (1981).

¶66 The lost volume seller theory described in these sections of the Restatement applies with equal force to goods and services. Restatement (Second) of Contracts § 350 cmt. d (1981) (referring to the sale of goods or services). As noted in Murray on

23

Contracts § 122 D.1 (3d ed. 1990), "[a] supplier of services may be able to convince a court that he would have been able to perform a second opportunity that became available after the original contract was breached." The supplier of services under these circumstances presumably "could have performed both contracts and received both profits absent strong evidence to the contrary." Murray on Contracts § 122 D.1 (3d ed. 1990). The extension of the lost volume seller theory to services is neither new, nor novel.

¶67    For example, the court in *Wired Music*, 168 N.E.2d 736, determined that a distributor of music by telephone wires with an unlimited supply of music could recover lost profits for the remaining months under a contract from a customer who discontinued service before the contract had expired. *Wired Music,* 168 N.E.2d at 738-39. The distributor had entered into another contract for service at the same location with a new tenant for a higher fee. The breaching party argued that the distributor had mitigated its damages through this new contract and thus relieved the breaching party of any liability. The court disagreed. The distributor had presented evidence that it could supply any number of additional customers without incurring further expenses except for the rental wire. To adopt the breaching party's contention "would have the effect of denying the [distributor] the benefit of his bargain." *Wired Music*, 168 N.E.2d at 738-39. The court refused to apply its usual mitigation of damages rule as it would have served to deprive the distributor "of the true measure of damages." *Wired Music*, 168 N.E.2d at 739.

¶68    The court in *Gianetti* likewise recognized that "[a]lthough the lost volume seller theory is commonly understood to apply to contracts involving the sale of goods, it

applies with equal force to contracts involving the performance of personal services such as employment contracts." *Gianetti*, 833 A.2d at 897. Similarly, the court in *Jetz Service Co.*, 865 P.2d at 1057-58, applied the lost volume seller theory to a provider of leased laundry equipment. *See also C.I.C. Corp. v. Ragtime, Inc.*, 726 A.2d 316, 319-21 (N.J. Super. Ct. App. Div. 1999) (lessor of vending machines). We agree with the courts in these other jurisdictions and apply the lost volume seller theory of damages to services, as provided by Bitterroot in this case.

¶69   Western argues finally that because Bitterroot failed to "prove" the required elements to qualify as a lost volume seller, the District Court abused its discretion in instructing the jury regarding lost volume seller damages. Western appears to argue that the District Court first should have resolved whether Bitterroot was a lost volume seller before the court permitted the jury to consider lost volume seller damages. The question of whether an injured party violated its duty to mitigate damages presents a question for the trier of fact. *Bronken's*, 203 Mont. at 433, 661 P.2d at 864. Our review of the relevant case law indicates that the question of whether an injured party qualifies as a lost volume seller likewise presents a question to be resolved by the trier of fact. *See e.g. Bill's Coal Co. v. Board of Public Utilities*, 887 F.2d 242, 245 (10th Cir. 1989); *C.I.C. Corp.*, 726 A.2d at 319-20; *Gianetti*, 833 A.2d at 900; 67A Am. Jur. 2d Sales § 1004 citing *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1130 (3d Cir. 1992). The jury served that role here. Western cites no authority to the contrary.

¶70   The question arises whether the jury properly found Bitterroot to be a lost volume seller. We review a jury's findings of fact to determine whether substantial credible

evidence supports those findings. *Hoffman v. Austin*, 2006 MT 289, ¶ 13, 334 Mont. 357, ¶ 13, 147 P.3d 177, ¶ 13. Bitterroot presented evidence that it expected its business to grow at a rate of thirteen to fourteen percent per year, buttressed by the introduction into evidence of its tax returns and consolidated financial statements. Bitterroot also presented evidence that it had a brokerage division that could contract with other carriers to handle excess freight volume. Thus, Bitterroot argued, it profitably could have serviced the Western contract and other contracts that it entered after Western's breach. Substantial credible evidence supports the jury's determination that Bitterroot qualified as a lost volume seller. *Hoffman*, ¶ 13.

¶71 The District Court instructed the jury on the concepts of mitigation and the lost volume seller theory. Both instructions represent correct statements of the law. The jury served the role of resolving any factual disputes regarding Bitterroot's duty to mitigate its losses and its alleged ability profitably to service the Western contract and the other contract that it entered after Western's breach. Our role is to determine whether these instructions, in their entirety, state the applicable law. *Christofferson*, ¶ 9. We determine that the District Court did not abuse its discretion in offering the lost volume seller theory instruction to the jury.

¶72 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON

/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ JOHN WARNER