Justice Jim Rice, dissenting.
***514 ¶38 My reading of the record leads to a different conclusion than the Court's. I disagree with the District Court's grant of summary judgment, and would remand for further proceedings based upon Ferdig Oil's summary judgment showing that ROC had breached the parties' contract.
¶39 ROC attempts to frame this dispute as one solely about its concerns over operational safety. It argues, "[a]t no time did ROC refuse Ferdig's connection; ROC simply sought confirmation that the line was sound and safe to operate." ROC's appellate brief opens with a section entitled, "Requesting Assurance That the Line Was Safe to Re-Open Was Not a Breach," followed by its alternative argument that, "even if ROC's request for safety assurances had been a breach," Ferdig Oil failed to mitigate its damages. However, despite the posturing by ROC to make this case about safety concerns, and its assertions that "at no time" did it refuse the connection to which Ferdig Oil was contractually entitled, and that it "simply sought" confirmation that it was safe to proceed, the record reveals a different story, in my view. ROC was engaged in much more, from which it attempts to divert attention.
¶40 The key evidence is the e-mail of July 24, 2014, from ROC's counsel. Consistent with its litigation strategy, ROC heavily emphasizes the first paragraph of that e-mail, which discussed safety concerns, by quoting that paragraph verbatim in its briefing. Then, it conveniently omits the second paragraph of that e-mail from its verbatim quotation. The Court acknowledges the need to read the second paragraph "in its entirety," Opinion, ¶ 18, but provides only a summary. However, I view this evidence as critical. That paragraph stated:
Assuming that we can get past those [safety testing] details, we still have the concern that agreeing to open the taps and resume production prejudices the defendants' rights in the lawsuit. We claim that the contract is properly terminated and/or terminable. We contend that problems with Ferdig's operations are a proper basis for termination. If we agree to resuming operations (especially before the safety issues raised above are fully resolved), we are creating evidence that you would be able to use against us. Any deal to continue production would have to address that via a non-waiver, non-admissibility agreement, and I do not know that that would be workable. We are not saying no to the request at ***515 this point, and we have some time to continue talking about it while we work through the issues in the first paragraph. However, I propose that it would be better to approach this via an effort to reach a global resolution of all claims. We *128 would prefer to work out all issues than to have a piecemeal deal that allows production to continue but that does not resolve the basic claims in the case, and that also creates the risk of undermining some of our points in the lawsuit. If you are interested in a global resolution, then we would ask you to make a proposal that includes payment for the right to resume a contract that we contend is properly terminated or terminable, and a time limit after which the parties may end their dealings. If you are not interested in that, then I would appreciate your thoughts about a non-waiver, non-admissibility agreement if we were to agree to production during the pendency of this litigation. (emphasis added).
¶41 The Court gives this paragraph an interpretation offered by neither party, even ROC. While ROC minimizes this language as merely the exercise of its "absolute right" to ensure that the "pipeline on its property could be operated safely," the Court holds that the language was simply "a request for discussion," "an attempt by ROC ... to resolve the lawsuit," "an attempt to protect ROC's litigation positions," and "a request for settlement negotiations." Opinion, ¶¶ 18, 20. Contrary to the interpretation offered by ROC, the Court injects its own interpretation and excuses any potential breach, concluding the e-mail, when read in context of the parties' ongoing litigation, was merely ROC "refusing to undermine its own litigation posture." Opinion, ¶ 20. However, I draw a different conclusion.
¶42 The paragraph is replete with conditional language. First, it is clear from the first sentence that, even if Ferdig Oil complied with ROC's safety verification conditions, ROC would still refuse to reinstate Ferdig Oil's bargained-for access. Thus, ROC's argument-that "[a]t no time did ROC refuse Ferdig's connection; ROC simply sought confirmation that the line was sound and safe to operate"-is simply not true. ROC demanded more. ROC was determined to either get a better deal or to escape its contractual obligations by using its control of the access to lever new conditions for Ferdig Oil's continued access, beyond the parties' previous agreement. At a minimum-even if the parties could not agree to a global settlement of all the legal issues between them, which ROC said would also require additional payment for resumption of access-ROC was demanding additional conditions, including a "non-waiver, non-admissibility" provision, in order for Ferdig Oil to receive its ***516 bargained-for access. ("Any deal to continue production would have to address ... a non-waiver, non-admissibility agreement, and I do not know that that would be workable."). I believe the Court's rendering of this message, in its entirety, as a "request for discussion," "an attempt by ROC to resolve the lawsuit," or "an attempt to protect ROC's litigation positions" falls short, because ROC was permanently eliminating the status quo under the parties' contract.[1] I thus disagree with the District Court's conclusion that "[no] admissible evidence was submitted that [ROC] had breached any contract with [Ferdig Oil]."
¶43 It is true that ROC's lawyer-drafted message included partially mollifying language, such as "[w]e are not saying no to the request at this point," but even this language can be read as conveying the idea that ROC deemed itself in charge, and that it would deny bargained-for access to Ferdig Oil unless its additional demands were met. Thus, this does not serve to erase the breaching effect of the message.
¶44 ROC alternatively argues that, if it breached the contract, Ferdig Oil failed to mitigate its damages by complying with *129 ROC's new contractual demands and then "su[ing] for the costs, if any, of compliance," citing the Bitterroot Int'l Systems, Ltd. v. Western Star Trucks , 2007 MT 48, 336 Mont. 145, 153 P.3d 627, and the Restatement (Second) of Contracts (Am. Law Inst. 1981). However, ROC's e-mail foreclosed that very option by demanding that Ferdig Oil agree that its reinstated access would be "non-admissible" in future litigation. If Ferdig Oil could not disclose its continued access, then it would be impossible for Ferdig Oil to comply with the new terms and "sue for the costs" of complying, as mitigation required. Because ROC's demands boxed Ferdig Oil in, I disagree with the District Court's conclusion that the Ferdig Oil parties "had a duty to mitigate their claimed damages, and they failed to do so."
¶45 I believe there exists here a material issue of fact going to the ***517 issue of breach of contract. At a minimum, there are factual issues about what the e-mail meant and what ROC intended by its wording, such that these questions should be addressed in further proceedings. I do not believe ROC has established that it is entitled to judgment on the breach of contract claim as a matter of law.
Justice Dirk Sandefur and Justice James Jeremiah Shea join in the dissenting Opinion of Justice Jim Rice.

The Court excuses any breach of the contract by ROC simply because the parties were then engaged in litigation. No support is offered for the proposition that ongoing litigation excuses a party's obligations under a contract prior to a court's ruling. Even as ROC legally sought to end the contract, it simultaneously attempted to extract further concessions by threat of immediately terminating access-after initially demanding that Ferdig Oil complete safety conditions, which Ferdig Oil satisfied, only then to place further conditions and cost on access. The Court's assertion that the valve being closed for seven months somehow excuses ROC's refusal to reopen it is not determinative. Ferdig Oil had a contractual right to use the valve before and after the repair, and ROC's conduct was a potential breach. If ROC had only wanted to terminate the contract, it was unnecessary to require Ferdig Oil to complete safety conditions required for access.