

DA 11-0166

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 25

IN RE THE MARRIAGE OF
LAURIE F. CARAS,

        Petitioner, Appellant, and Cross-Appellee,

  and

WILLIAM R. CARAS,

        Respondent, Appellee, and Cross-Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Fourth Judicial District, In and For the County of Missoula, Cause No. DR 03-192 Honorable John W. Larson, Presiding Judge |

COUNSEL OF RECORD:

    For Appellant:

        Elizabeth Best; Best Law Offices, P.C.; Great Falls, Montana

    For Appellee:

        Richard A. Reep; Reep, Bell & Laird, P.C.; Missoula, Montana

                Submitted on Briefs: November 2, 2011

                      Decided: February 1, 2012

Filed:

                          Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant Laurie Caras (Laurie), now known as Laurie Robinson, filed a petition for dissolution of her marriage in March, 2003 to Appellee William Caras (Bill), in the Fourth Judicial District Court, Missoula County.  Following trial in August of 2010, the District Court found the marriage to be irretrievably broken, divided property between the parties, ordered Bill to pay child support and Laurie's attorney fees, and denied Laurie's request for maintenance.  Laurie appeals and Bill cross-appeals. We affirm. Laurie raises three issues:

¶2     *1.  Did the District Court err in identifying and valuing marital assets?*

¶3     *2.  Did the District Court err in its division of the marital estate?*

¶4     *3.  Did the District Court err by failing to award maintenance to Laurie?*

¶5     Bill raises the following issues:

¶6     *4.  Is Laurie bound by stipulations and pleadings as to the character of premarital property?*

¶7     *5.  Did the District Court err in calculating the amount of Bill's premarital contribution credit on certain properties?*

¶8     *6.  Did the District Court err in requiring Bill to pay Laurie's attorney fees and in the calculation of those fees?*

¶9     *7.  Did the District Court err in allocating to Bill $71,900 in "remaining artwork?"*

2

¶10    Due to the overlapping nature of the issues, we will address issues 2, 4, 5, and 7 together, and issues 3 and 6 together.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

¶11    Bill and Laurie were married on June 19, 1992, and lived in Missoula. The parties separated in 2003. Two children were born of the marriage, one of whom is still a minor. The marriage was Laurie's first and the second for Bill.[2] Bill has two children from his first marriage who are now adults.

¶12    For the majority of the marriage, Laurie was a homemaker, taking primary responsibility for raising the parties' two children and Bill's two children from his first

---

[1] Citing to *Turner v. Mountain Eng'g & Constr., Inc.*, 276 Mont. 55, 63-64, 915 P.2d 799, 804-05 (1996), Bill argues that Laurie's appeal is moot because subject properties have now been transferred to the parties individually, debts have been paid or refinanced, and Laurie failed to obtain a stay of judgment. "In deciding whether a case is moot, we determine whether this Court can fashion effective relief." *Turner*, 276 Mont. at 61, 915 P.2d at 803 (citations omitted); *see also Gateway Opencut Mining Action Group v. Bd. of Co. Commrs. of Gallatin Co.*, 2011 MT 198, ¶ 16, 361 Mont. 398, 260 P.3d 133 (citation omitted) ("'[I]f the issue presented at the outset of the action has ceased to exist or is no longer 'live,' or if the court is unable due to an intervening event or change in circumstances to grant effective relief or to restore the parties to their original position, then the issue before the court is moot.'"). In *Turner*, the appeal was moot because the subject property had been sold at a sheriff's sale and third party interests were involved. *Turner*, 276 Mont. at 63, 915 P.2d at 804. In *In re Marriage of Dahm*, 2006 MT 230, ¶ 37, 333 Mont. 453, 143 P.3d 432, *overruled on other grounds*, *In re Marriage of Funk*, 2012 MT 14, ___Mont.___, ___P.3d___, we distinguished *Turner* because "[n]o disruption of the possession of real property or to the interests of third parties" was necessary, and "effective relief only requires correction of an error in the judgment—here, a judgment that divided the marital estate between the parties before the Court." Though Bill obtained refinancing between entry of the Decree and the appeal, the parties are the same, the properties have not been sold to a third party, and the third party creditor interests have been present throughout the course of the proceeding. Similar to *Dahm*, this Court can still render effective relief between the parties, and the appeal is not moot.

[2] The dissolution of Bill's first marriage was the subject of two prior appeals: *In re Marriage of Caras* ("*Caras I*"), 254 Mont. 169, 835 P.2d 715 (1992) and *In re Marriage of Caras* ("*Caras II*"), 263 Mont. 377, 868 P.2d 615 (1994).

3

marriage, and maintaining the marital home. The District Court determined that Laurie would be the primary physical custodian, which is not challenged on appeal.

¶13    Laurie is now employed part-time at an interior design business, earning approximately $30,000 a year. Bill owns Caras Nursery, manages various rental properties, and receives income from certain partnerships he had acquired before the marriage. Bill's average income in the years leading up to the dissolution was $271,191.

¶14    At the time of dissolution, the parties had substantial real property interests. The District Court's description and distribution of these properties are as follows:

a. 2717 S. Third West, a residential rental property valued at $350,000 with a $50,000 mortgage. The parties used this property as the marital residence from 1992 until the parties' separation. Bill's parents gifted the property to Bill in 1999. The property is currently rented for $1,400 a month, income which Bill receives. Bill argued that this property should be his separate premarital asset, but the District Court concluded that the property had been commingled, making it a marital asset. The District Court awarded this asset and its debt to Bill.

b. 2210 Hilda, a residential property valued at $395,000 with a $315,000 mortgage. This property has been the primary residence for Laurie and the minor children since its acquisition in 2006. The down payment for this property came from Bill's premarital assets, and the District Court concluded that Bill had a premarital interest in the property of $55,000. The District

4

Court awarded this property to Laurie, requiring Bill to assume and refinance the debt solely in his name.

c. 2803 S. Third West, a residential property valued at $525,000 with a $393,750 mortgage. Bill borrowed $135,000 from Caras Nursery to purchase the property in 2006, and he argued that $135,000 of this property should be designated as his premarital asset. The District Court, after determining that Caras Nursery and its income were marital assets, likewise designated this property to be commingled and a marital asset. The District Court awarded this property and its debt to Bill.

d. A Flathead Lake cabin (known as the "blue cabin") valued at $1,000,000. There is no debt against this property. The District Court noted that the "parties' [sic] agree that this property should be awarded to Bill as his premarital property."

e. A Flathead Lake cabin (known as the "red cabin") that the District Court valued at $750,000. There is a mortgage of $136,000, an additional encumbrance of $160,000 for a bank loan, and an attorney's lien from one of Laurie's prior attorneys for approximately $30,000 against the property. The parties purchased the property in 2000, using $60,000 of Bill's premarital assets, which the District Court credited to Bill. While Laurie requested this property, the District Court awarded it to Bill, along with the debt.

f.  A timeshare at a Whitefish, Montana resort, valued at $0. The District Court noted that the parties agreed this property should be awarded to Bill as his premarital property.

g.  1502 S. Sixth Street West, a residential rental property valued at $125,000, with a mortgage of $160,000. The District Court noted that the parties had agreed that this property should be awarded to Bill as premarital property.

h.  440 Blaine Street, a residential rental property valued at $300,000, with a mortgage of $89,000. The District Court noted the parties had agreed that this property should be awarded to Bill as his premarital property.

i.  1530 Reserve Street, a residential rental property valued at $283,140 with a mortgage of $112,000. Again, the District Court noted that the parties had agreed this property should be awarded to Bill as his premarital property.

j.  250 Mary, a residential rental property valued at $250,000, with no debt. The parties purchased this property in 2000 and used Bill's premarital assets for the down payment of $23,000. The District Court credited Bill for his $23,000 premarital interest, but awarded the property to Laurie "free and clear."

k.  1536 Reserve Street, a commercial rental property valued at $566,280 with a mortgage of $113,000. This property was acquired during the marriage using $90,000 of Bill's premarital assets. The District Court credited Bill for his $90,000 of premarital interest and combined Bill's other premarital interests

6

together in determining that Bill should receive this commercial property "in total as an offset against his comingled [sic] premarital interests."

¶15 At the time of this dissolution, the parties also had business interests, which the District Court awarded as follows:

a. Caras Nursery. Bill is the sole proprietor of this business, valued at $2,117,000 by professional report. In 1990, Caras Nursery also acquired approximately 11 acres of property adjacent to the business valued at $700,000 by professional report. The District Court awarded the business to Bill but found that "Laurie's contribution permitted Bill to develop and expand his business."

b. JKW Investments/Quality Properties, LLP. Bill acquired a 1/3 interest in JKW in 1982 and a 1/6 interest in Quality Properties in 1998. The stipulated value of the combined businesses is $1,000,000. According to the District Court, the parties "have agreed that this business interest should be awarded to Bill as his premarital asset, but that the income he receives from the business should be considered in determining any child support or maintenance obligations."

¶16 At the time of this dissolution, the parties had interests in the following retirement accounts, which were distributed as follows:

a. Employee Benefit Resources Pension/PS 401(k) with a balance of $110,734. The District Court determined that this pension was a marital asset to be distributed to Bill.

b. Solomon IRA with an estimated balance of $130,000. The parties agreed that this account should be awarded to Bill as his premarital property.

c. Putnam IRA with an approximate stipulated balance of $30,000, which the parties agreed should be awarded to Bill as premarital property.

d. Piper IRA with an approximate stipulated balance of $4,000, which the parties agreed should be awarded to Bill as premarital property.

¶17 The District Court found that Laurie had artwork valued at $28,100 in her possession, which would be awarded to her. The District Court also noted that "Bill testified that he believes that there is an additional $71,900 in artwork remaining in the marital estate. Bill should retain any remaining artwork." Further, the District Court ordered that Bill would be responsible for Laurie's attorney fees and expenses of litigation. Other personal property has been divided between the parties and is not at issue.

**STANDARD OF REVIEW**

¶18 "We review a district court's findings of fact regarding a division of marital assets to determine whether the findings are clearly erroneous. Findings are clearly erroneous if: (1) they are not supported by substantial evidence; (2) the district court misapprehended the effect of the evidence; or (3) the district court made a mistake. We review a district court's conclusions of law to determine whether the conclusions are correct." *In re Marriage of Bartsch*, 2007 MT 136, ¶ 9, 337 Mont. 386, 162 P.3d 72. If the findings are not clearly erroneous, then the court's division of property will be

8

affirmed unless there is an abuse of discretion. *In re Marriage of Payer*, 2005 MT 89, ¶ 9, 326 Mont. 459, 110 P.3d 460 (citation omitted); *see also In re Marriage of Foreman*, 1999 MT 89, ¶ 14, 294 Mont. 181, 979 P.2d 193 (citation omitted) ("In reviewing discretionary trial court rulings, including marital estate distributions and the valuations of marital property pursuant to dissolution, we determine whether the district court abused its discretion."). We review a district court's award of attorney fees in a dissolution proceeding for abuse of discretion. *In re Marriage of Chamberlin*, 2011 MT 253, ¶ 10, 362 Mont. 226, 262 P.3d 1097 (citation omitted). "A district court abuses its discretion if it 'acts arbitrarily without employment of conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice.'" *Chamberlin*, ¶ 10 (citation omitted).

## DISCUSSION

¶19 *1. Did the District Court err in identifying and valuing marital assets?*

¶20 Laurie argues that the District Court abused its discretion by allowing Bill to present his case without first filing a final disclosure prior to trial, as required by § 40-4-254, MCA.[3] Laurie also argues that "[t]he District Court made no finding of good cause for Bill's failure to file a final disclosure." However, the District Court addressed the issue as follows: "Bill failed to serve Laurie with a final declaration of disclosure and a

---

[3] Section 40-4-254, MCA, states: "Absent good cause, the court may not enter a judgment with respect to the parties' property rights unless each party has executed and served a copy of the final declaration of disclosure and current income and expense declaration. Each party shall execute and file with the court a declaration signed under penalty of perjury stating that service of the final declaration of disclosure and current income and expense declaration was made on the other party."

current income and expense declaration executed under penalty of perjury. Bill did exchange detailed value information prior to trial and at trial, introduced detailed exhibits concerning assets, debts, income and expenses. They were not executed under penalty of perjury as required by statute, but his testimony was on the record and under oath." The District Court further found that "at his deposition, Bill submitted, under oath, a property asset [and] debt summary, in which he identified values for the real property contained in the marital estate," that "the parties have had ample time to discover the assets and liabilities of the marital estate," and that "[t]he mutual requirement of asset disclosure has been satisfied." Accordingly, the District Court concluded: "Given the seven year duration of this dissolution of marriage proceeding and the significant amount of time that the parties have had to discover the assets and liabilities of the marital estate, *good cause exists* to enter these *Findings of Fact Conclusions of Law and Decree of Dissolution*." (First emphasis added.)

¶21 Laurie also argues that Bill's provision of a preliminary disclosure in December 2009, and a revised preliminary disclosure in the week before trial—instead of a final disclosure—deprived her of the protection inherent in § 40-4-254, MCA, and prevented the District Court from properly valuing the estate. However, at the beginning of trial, Laurie's trial counsel stated to the District Court:

> We did take Mr. Caras's deposition on April 29th of this year and at that time we were provided an updated statement -- a listing of the assets and liabilities in the Caras marital estate. . . .
> After we received that updated list of values from Bill Caras, we could go out and verify that the values that he represented at that time were at least within a ballpark of values that we thought we could live with, *and*

10

*in an effort to cut down time, costs, and expense in this case, we decided simply to go with those values.*

On Wednesday Mr. Reep presented us with a -- another, from their perspective, updated statement of values of some of the assets of the Caras estate. *I understand that in divorce actions the parties are able to testify to what they think the value of the marital estate may be at the time of trial, and I understand that Bill will probably testify that some of the numbers that he presented to us at the April 29th, 2010, deposition are now different and that will be fine. The court can take that into consideration.*

But our findings are based upon the representations made by Mr. Caras as of April 29, 2010, and that will be . . . the testimony of my client when I put her on the witness stand and ask her what she thinks the value of the estate is.

(Emphases added.) Bill's attorney responded: "[T]his is a marital estate that has a significant amount of real estate involved in it, whether premarital or otherwise, and given the state of the economy, we wanted to give the court the most current values and that's the reason for this modification, but I'm sure we can sort this out through testimony." Laurie testified that the values set forth in her final disclosure were based upon Bill's valuation of assets at his deposition. The District Court found that "Laurie . . . retained experts to verify the accuracy of [Bill's deposition] valuations and ultimately agreed with Bill's valuation." While Bill presented expert testimony during trial, Laurie did not.

¶22 As this record indicates, Laurie did not claim any prejudice from the lack of a final disclosure, and her counsel indicated "we decided simply to go with those values" given by Bill in his April 2010 deposition. Laurie's trial counsel did not object to the updated disclosure filed by Bill, noting that Bill would probably testify about the updated values and stating "that will be fine" and "[t]he court can take that into consideration." Laurie

11

did not present any independent valuation of the assets at trial and instead relied on Bill's valuations. "'We will not put a district court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which the appellant made no objection.'" *In re Marriage of Stevens*, 2011 MT 106, ¶ 28, 360 Mont. 344, 253 P.3d 877 (citations omitted). We conclude that the District Court was not prevented from properly valuing the properties of the estate.

¶23 *Issues 2, 4, 5, and 7: Did the District Court err in its division of the marital estate? Is Laurie bound by stipulations and pleadings as to the character of premarital property? Did the District Court err in calculating the amount of Bill's premarital contribution credit on certain properties? Did the District Court err in allocating to Bill $71,900 in "remaining artwork?"*

¶24 Laurie contests the District Court's distribution of marital property. Bill responds that the District Court's distribution was "remarkably similar" to the distribution Laurie proposed. On cross-appeal, Bill asserts that Laurie is bound by her stipulations regarding his premarital property, that he was not properly credited for his premarital contribution on certain properties, and that the District Court erred in attributing $71,900 of artwork to him. Because Laurie's arguments pertain to the value of the marital estate, we begin with Bill's cross-appeal arguments relating to the District Court's valuation of the properties.

### A. Stipulations as to Premarital Property

¶25 Bill argues that Laurie's pleadings and stipulations constitute judicial admissions as to the exclusion of premarital property from the marital estate. "A judicial admission is 'an express waiver made in court by a party or its counsel conceding the truth of an alleged fact.'" *In re Marriage of Hart*, 2011 MT 102, ¶ 14, 360 Mont. 308, 258 P.3d 389

12

(quoting *Bitterroot Intl. Sys., Ltd. v. Western Star Trucks, Inc.*, 2007 MT 48, ¶ 41, 336 Mont. 145, 153 P.3d 627). A judicial admission can take place at any point during the litigation process, and to be binding, such an admission must be an unequivocal factual statement. *Hart*, ¶ 14 (citations omitted). "A judicial admission has a conclusive effect upon the party who makes it, and prevents that party from introducing further evidence to prove, disprove, or contradict the admitted fact." *Bitterroot Intl. Sys.*, ¶ 41 (citation omitted).

¶26 In Laurie's proposed Findings of Fact, Conclusions of Law, and Decree of Dissolution filed before trial, she listed the following properties as Bill's premarital assets based upon agreement of the parties: the blue cabin, time share, 1502 S. Sixth Street rental property, 440 Blaine Street rental property, 1530 Reserve rental property, JKW Investments/Quality Properties, Solomon IRA, Putnam IRA, and Piper IRA. Further, on the attached proposed allocation table, Laurie did not even list these as distributable assets. In her supplemental proposed findings filed post-trial, Laurie designated the same properties as Bill's premarital assets. On the allocation table attached to her supplemental findings, Laurie listed these properties but designated them, and their value of $2,872,140, as "Separate Premarital." Further, she *subtracted* this amount from her calculation of the total value of the marital estate. Thus, Laurie's post-trial filings

13

calculate the "Total Marital Estate" as nearly $4.5 million, not the $7.2 million she uses on appeal.[4]

¶27 Laurie's written submissions were supplemented by various statements she made during trial. She testified that the Solomon IRA, Putnam IRA, Piper IRA, and the 440 Blaine property were Bill's premarital assets. She said she was not making any claim to the blue cabin, JKW Investments or Quality Properties and that Bill should retain the timeshare, the 1502 S. Sixth property, and the 440 Blaine property. At one point, Bill's counsel asked Laurie's counsel if the 1530 Reserve property was stipulated as premarital property, but Laurie's counsel disagreed. However, Laurie's post-trial filing changed positions, stating the parties "have agreed that this property [1530 Reserve] should be awarded to Bill as his premarital property," which the District court accepted.

¶28 Laurie responds that Bill mischaracterizes the stipulations made at trial. She points to the statement made by her counsel with regard to the stipulation on JKW:

> MR. REEP [Bill's counsel]: And, Mr. Scott, we have a stipulation that JKW, the asset JKW, is indeed a premarital asset, do we not?
>
> MR. SCOTT [Laurie's trial counsel]: Premarital. I just want to be clear about the stipulation on the premarital. *I'm not conceding that it's not part of the marital estate pursuant to the statute but it's certainly premarital.*

---

[4] There appears to have been a mathematical error in this filing, which was then continued in the court's Decree. In Laurie's filing, the figure for the value of Bill's premarital property (excluded from the estate) was understated when carried over to her final calculations, which affected the stated value of the total estate. While Laurie's filing values the marital estate at approximately $4.56 million, the correct amount calculated from her figures should have been approximately $4.16 million.

MR. REEP: Okay. I guess my question is a little more direct than that. Do we have an agreement that that is not a distributable asset in this dissolution proceeding?

MR. SCOTT: *We have a stipulation that Laurie's not making a claim to it.*

(Emphases added.) Laurie also references a statement she made during cross examination that she was asking the District Court to give her some of Bill's premarital property and argues, that "[a]ny stipulations that certain property was 'premarital' were not stipulations that they should be excluded from . . . the marital estate." However, Laurie's filings certainly contradict that argument. Her allocation tables excluded the value of premarital properties from the estate's value or excluded those properties from the list of distributable assets. She suggested that certain property "should be awarded to Bill as his premarital property." While she points to a distinction made at one point by her counsel that "premarital" property did not necessarily mean "it's not part of the marital estate," that distinction was not maintained by Laurie throughout the litigation and, in fact, she commonly excluded premarital properties from her calculations altogether. "'It is improper to raise an issue upon appeal as to a question of law or fact after the parties have entered into a stipulation as to that law or fact.'" *In re Marriage of Prevost*, 225 Mont. 116, 118, 731 P.2d 344, 345 (1987) (citation omitted). We cannot fault the District Court's determination of the distributable estate in this complicated matter, given the filings which Laurie gave it to consider. She is bound by those filings which essentially allocated to Bill certain premarital properties from the distributable marital estate.

15

### B. Artwork attributed to Bill

¶29    Bill argues the court erred by attributing $71,900 in artwork to him without substantial credible evidence.  Laurie contends that the District Court did not err.

¶30    Bill offered a trial exhibit, admitted by the court, which listed the parties' "Artwork/Antiques" at $100,000, a figure about which he also testified.  When asked about this amount, Bill testified:  "Well, again I just picked a number.  I didn't really have any idea because I didn't have an inventory, but I do also feel that this is incomplete, but I don't believe it's going to approach the hundred thousand dollar level."  The parties stipulated that an art appraisal was conducted on the artwork in Laurie's possession, which was valued at $28,100.  In her proposed findings, Laurie stated that "Bill should retain the remaining artwork valued at $71,900."  Asked why she attributed a majority of the artwork to Bill, Laurie testified that "in the information we got from Bill, he said that there was a hundred thousand dollars worth of art that we had and . . . I asked -- Tim Gordon is an appraiser, and I asked him to come to my house and appraise the art that I have at the house, and he put a $28,000 value on it . . . .  I don't know where the difference between the hundred that Bill is saying that we have and what Tim appraised."  She also testified as to the artwork:  "So I'm basically hitting that tennis ball back into his court."  However, Laurie further testified that Bill "has probably four or five Monte Dolack lithographs," "one larger piece of original art that we purchased together by Kathryn Kress that's up at the red cabin," and "he has things hanging all over his house on 3rd Street, and he has artwork up at the lake in the blue cabin, and he has

16

artwork in the red cabin." Bill testified that he did not have the balance of the value of the remaining artwork, offering that he had "two or three original paintings," and did not know the value of any of those pieces of art.

¶31 "[P]arties to a dissolution proceeding have a duty to assist the trial court in acquiring information needed to determine an appropriate distribution of marital property. Where a party fails to introduce credible evidence of the value of a piece of marital property, a court is free to utilize credible evidence of value submitted by the other party." *Foreman*, ¶ 37 (citations omitted). In light of minimal evidence in the record, we will not second-guess the District Court's determination to attribute the $71,900 in artwork to Bill.

### C. Bill's Premarital Contribution Credit for Certain Property

¶32 Bill's next cross-appeal issue is that the District Court did not give him proper premarital contribution credit for certain properties. Laurie responds that "Bill was given more credit for his contribution than he deserved." (Emphasis omitted.)

¶33 We pause here to note that "marital" versus "nonmarital" property is unfortunate nomenclature which this Court recently discarded in *In re Marriage of Funk*, 2012 MT 14, ___ Mont. ___, ___ P.3d ___. While premarital property and property acquired by gift, bequest, devise and descent is given special consideration under § 40-4-202, MCA, all property is included within the marital estate and subject to equitable distribution. *Funk*, ¶ 19. "In other words, *everything* owned jointly or by either party must be equitably apportioned by the district court in a dissolution proceeding regardless of when

or how it was acquired." *Funk*, ¶ 13. "[T]he court has the ultimate authority to distribute all property of both spouses; it is not required to subtract premarital assets or inheritances from the marital estate before dividing it, nor is it limited in its authority to determine how such assets are to be divided." *Funk*, ¶ 16. As we will further note herein, our decision in this case is not inconsistent with *Funk*, due to the evidence of record, the parties' trial actions, the particular determinations reached by the District Court—despite its occasional use of incorrect nomenclature—and our ultimate conclusions.

¶34    Bill argues that he should have received more premarital credit on 2210 Hilda. He asserts that the District Court incorrectly found only $55,000 in premarital contribution for the down payment on the property, instead of the $80,000 that he actually paid. Both Laurie and Bill testified to the $80,000 down payment amount, and Bill listed that amount in his proposed and supplemental findings. It appears the District Court mistakenly attributed only $55,000 of the down payment as Bill's premarital contribution, shorting Bill's contribution by $25,000, due to the incorrect amount being listed in Laurie's supplemental findings.[5] Further, Bill argues that he was not given credit for the $52,000 second mortgage on the Hilda property. The District Court noted the first mortgage of $315,000, but failed to account for the second mortgage, about which both parties testified. It thus appears that the $52,000 second mortgage was also mistakenly omitted from the District Court's Decree. We discuss these errors further herein.

---

[5] Laurie's supplemental findings were used by the District Court as a template for the final Decree.

¶35 We disagree with Bill's remaining arguments about the designation of other properties as gifted or premarital, or, in other words, as lacking any contribution from Laurie. Bill argues that Caras Nursery, valued at $2,117,000 and the largest asset, should not have been deemed a marital asset. He asserts that "Laurie was asking for an award . . . never having worked at Caras Nursery . . . and her only contribution having been 'homemaker' services." While the District Court recognized that Bill acquired the business before his marriage to Laurie, and awarded the Nursery and the associated acreage to Bill, it found that the Nursery was a marital asset due to Laurie's contributions as a homemaker.

¶36 Section 40-4-202(1), MCA, provides that, "[i]n dividing property acquired prior to the marriage . . . the court shall consider those contributions of the other spouse to the marriage, including:

> (a) the nonmonetary contribution of a homemaker;
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

Consistent with our decision in *Funk*, we have previously explained that this statute "embraces the theory that all property is to be distributed equitably, considering all of the circumstances of a particular marriage. The theory of equitable distribution recognizes, and attempts to compensate for, each party's contribution to the marriage." *Bartsch*, ¶ 20. Here, the District Court considered the factors of § 40-4-202(1)(a)-(c), MCA. Regarding Caras Nursery, the District Court found that, although Laurie did not directly

contribute to the Nursery, her work as a homemaker "helped maintain and enhance the value of the business. . . . In effect, Laurie's contribution permitted Bill to develop and expand his business." Laurie testified that she helped increase the value of the Nursery in that it was her "job to be home with the kids . . . and primarily that allowed -- it allowed Bill primarily to be at work . . . as much as he needed to be." She also testified that her homemaker services enhanced the value of the Caras Nursery acreage by "the fact that I was able to be home with the four kids and that Bill was available to leave whenever he needed to leave in the mornings and come back whenever he needed to come back at night allowed the business to grow financially which allowed the business to pay for the bare acreage during the course of our marriage." Although the District Court concluded that Caras Nursery was a "marital asset," an unnecessary holding under *Funk*, nonetheless the outcome is still appropriate: Laurie was entitled to share in Caras Nursery (or its value), a premarital asset, because of contributions she made to the marriage under § 40-4-202(1)(a)-(c), MCA. *See Bartsch*, ¶ 27 (citation omitted) ("Without her contributions in caring for the children and the home, [the husband] would not have been able to devote the considerable time and effort the business required in order to preserve its value."); *In re Marriage of Taylor*, 257 Mont. 122, 126, 848 P.2d 478, 480 (1993) ("[The wife]'s nonmonetary contributions as a homemaker facilitated the maintenance of the honey business because [the husband] would not have been able to devote the considerable time and effort the business required were it not for [the wife]'s caring for the children and the home.").

20

¶37   Bill also argues that any appreciation in the Nursery real estate or extra acreage would be due to market factors since "[o]nly modest improvements had been made to the operation." However, in *Funk*, we overturned past cases which held that a non-acquiring spouse is limited to an equitable share of the appreciated value of such property attributable to that spouse's efforts. *See Funk*, ¶ 26.  But, further, Bill's testimony militates against his argument, as he testified that he had made improvements to an existing greenhouse, added more greenhouses, and equipment.  On the extra acreage, Bill testified that they built a small greenhouse for approximately $30,000 to $60,000, and cleaned up the property.  Laurie testified, "They've improved.  They're cleaned up.  They're -- they're well cared for.  They -- they were a mess for years and that's been -- part of the improvements have gone on . . . ."  Thus, we disagree that the increased value of the Caras Nursery real estate and the extra acreage was due only to market factors.

¶38   Bill argues that the 2717 S. Third West property should not have been deemed a "marital asset" by the District Court since it was gifted to him by his parents.  Bill was given this property in the distribution, but to the extent its designation as premarital would still be relevant, the District Court found that the parties began living in this residence in 1992, Bill's parents gifted the property to him in 1999, and that the property was used as the marital residence until August 2003.  The court found that "[t]he parties worked together to remodel the property.  Laurie actively participated in the redesign of the property and Bill testified that they had fun working together, that they 'tag teamed' the project, and that they came up with some 'pretty cool stuff' together."  Laurie also

testified that while Bill's premarital funds were used for the initial remodel on the property, marital funds were used for subsequent remodeling including a new roof, paint, wallpaper, new furnace, new yard landscaping, and a new patio. The District Court did not err in concluding that both parties had contributed to the property.

¶39     Bill also contests the District Court's valuation of the property at $350,000. Bill testified the property was valued at $280,000, while Laurie testified to the $350,000 amount as based on "the representation of value made by Bill . . . at his deposition." Bill testified that he reduced the property's value because "I'm not sure that we had an expert do it. I think that was pretty much my -- kind of my opinion." He also testified that it was his best estimate at the time of trial. The District Court, as noted in its Decree, chose April 29, 2010, as the proper date of valuation of assets in the dissolution proceeding because it was the date of Bill's deposition, "when Bill testified to the value of assets which Laurie then adopted and relied upon . . . ." We conclude that the District Court did not err. *See Foreman*, ¶ 34 (citation omitted) (A district court has "ample discretion" to determine property values in a dissolution proceeding); *In re Marriage of Crilly*, 2005 MT 311, ¶ 19, 329 Mont. 479, 124 P.3d 1151 (citation omitted) ("A district court's valuation of marital property may be premised on expert testimony, lay testimony, documentary evidence or any combination thereof, as long as the valuation is reasonable in light of the evidence submitted.").

¶40     Bill argues that the 1536 Reserve Street property was erroneously declared "marital" since it was purchased with premarital funds and there was no evidence

provided by Laurie that she contributed to the acquisition or improvement of this property. Laurie testified that the property was purchased during the marriage and financed through Bill's sale of premarital land. The District Court noted that the property was acquired during the marriage and attributed $90,000 to Bill for his premarital contribution. The District Court awarded this entire property to Bill as an offset against his commingled premarital interests on other properties, including those awarded to Laurie. Similarly, Bill argues that the purchase price of the 250 Mary property was funded by Bill's premarital or gifted property, and the District Court erred by awarding him only a $23,000 premarital interest and fixing its value in time. The parties testified that this property was purchased during the marriage, and this property was not one stipulated as premarital. Bill suggested in his proposed findings that Laurie receive it. The District Court gave Bill premarital credit, but awarded the property to Laurie as part of its equitable distribution scheme. In light of this record and the overall equitable distribution of the estate, which we discuss below, we cannot conclude the District Court's determination with regard to these properties was in error.

¶41 Finally, Bill argues that "[c]learly, the growth in the red cabin was strictly due to market factors and the district court erroneously distributed this growth as marital property." First, as noted above, an increase in value due to market factors is not alone determinative under *Funk*. Beyond that, Bill testified that "Laurie and I worked together to come up with how we were going to fix it up, make it more habitable. It was not -- it had a lot of issues when we first bought it." He also testified that Laurie helped with the

23

remodeling in terms of the design, and she helped decorate the cabin. We disagree with Bill's contention that the District Court erred in considering the red cabin's value as part of the marital estate.

### D. Distribution of the Marital Estate

¶42 In her appeal, Laurie argues that the District Court erred in its property distribution, in that it "fail[ed] to consider Laurie's contributions as a homemaker" to the preservation and increase of the marital property. However, we disagree. As noted above, the District Court clearly considered Laurie's homemaker contributions to Caras Nursery, which factored into its decision to designate Caras Nursery as a marital asset. The District Court further stated: "Laurie's contribution to the marital estate was as a homemaker. Laurie raised not only her own children, but Bill's children from a previous marriage. Bill testified that he never expected Laurie to work and Laurie testified that she handled almost all of the day-to-day parenting responsibilities . . . ." In its conclusions of law, the District Court held: "Laurie's contribution to the marital estate was as a homemaker. As noted above, Laurie raised not only her own children, but Bill's children from a previous marriage. These contributions preserved and enhanced the value of Bill's premarital property." We conclude that the District Court fully considered Laurie's contributions as a homemaker, consistent with our decision in *Funk*.

¶43 Laurie contests the property distribution by arguing that "[s]he simply asked to be awarded two properties, free and clear: the house on Hilda, in which she lives, and the 'red cabin.'" She argues that she only requested "a total of $1,361,000 in marital assets,

24

or 18.8% of the marital estate."[6] She states that she only received "9.6% of the estate, $694,050." However, Laurie's numerical arguments are not as simple as they appear.

¶44 First, Laurie's numbers are based upon the $7.2 million valuation for the total marital estate which, as discussed above, she did not use in her written submissions to the District Court. While Laurie argues she requested assets valued at only $1,361,000, she fails to note the liabilities she asked that Bill be made to assume. The District Court set the value of the 2210 Hilda property at $395,000, but the mortgages totaled $367,000. The red cabin was valued at $750,000, with associated debts of $326,000. In asking for these properties "free and clear," she was essentially requesting that Bill be made to assume debt of $693,000. Instead, the District Court distributed to Laurie the 2210 Hilda property valued at $395,000, with the $367,000 debt assigned to Bill, and the income-producing 250 Mary property valued at $250,000, free and clear.

¶45 For his part, Bill acquired more liabilities than the District Court expressly allocated to him. In addition to the approximately $1.36 million in total debt that Bill was assigned, the District Court, as discussed above, failed to credit him for the second mortgage on the 2210 Hilda property of $52,000, while also failing to credit him for the additional $25,000 premarital contribution on the Hilda property. However, in the context of this large and complicated estate, we deem these errors harmless and unlikely to have altered the outcome. *See Newbauer v. Hinebauch*, 1998 MT 115, ¶ 20, 288 Mont. 482, 958 P.2d 705 (citation omitted) ("[N]o civil case shall be reversed by reason

___

[6] This number also includes a maintenance request in the amount of $216,000. The value of the properties alone was $1,145,000.

25

of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless.").

¶46 After carefully considering Laurie's and Bill's issues, we conclude the District Court did not abuse its discretion in equitably dividing the marital estate. "We never have set an exact formula for district courts to divide marital property. We allow district courts to determine how to distribute property fairly and affirm unless they have clearly abused their discretion. We apply a presumption of correctness to a district court's decision in these matters." *Chamberlin*, ¶ 13 (citations omitted). Further, "[c]ourts have discretion under § 40-4-202, MCA, to craft 'a fair distribution of the marital property using reasonable judgment and relying on common sense.'" *Chamberlin*, ¶ 19 (citations omitted). Laurie received substantial properties. Indeed, when viewed globally, Laurie basically received what she asked for: her residence, free from debt; and income-producing property, also free from debt. Bill received the businesses to continue his career, and the tools to manage the parties' substantial debt.

¶47 *Issues 3 and 6. Did the District Court err by failing to award maintenance to Laurie? Did the District Court err in requiring Bill to pay Laurie's attorney fees and in the calculation of those fees?*

¶48 Bill argues that the District Court erred in requiring him to pay Laurie's attorney fees, arguing that there was no substantial credible evidence supporting such a distribution to Laurie. Laurie does not respond to this argument. Section 40-4-110, MCA, governs awards of professional fees in dissolution actions, the purpose of which is to "ensure that both parties have timely and equitable access to marital financial

26

resources for costs incurred." We have held that an attorney fee award under this statute "must be reasonable, necessary, and based on competent evidence." *In re Marriage of Harkin*, 2000 MT 105, ¶ 72, 299 Mont. 298, 999 P.2d 969 (citation omitted).

¶49 We disagree with Bill's contention that "no evidence was taken which could support such a distribution or the necessity" of attorney fees. In its findings of fact, the District Court found that Laurie earned approximately $30,000 per year, whereas Bill's average income for the years 2006 through 2008 was $271,191. The District Court listed several attorneys used by Laurie throughout the proceeding, and noted that Laurie's first attorney had filed an attorney's lien on the red cabin for approximately $30,000. The District Court noted that in August of 2009, Laurie hired a new attorney and owed that attorney $31,405.89. The District Court found that "Bill is in the best position to pay for the attorney's fees and costs incurred in this dissolution of marriage proceeding, including those incurred at trial." In its conclusions of law, the District Court recited the standards for awarding attorney fees and then stated "[a]n award of attorney's fees is both necessary and reasonable given the disparity in income between the parties." We conclude the District Court did not err in ordering Bill to pay Laurie's attorney fees. *See Stevens*, ¶ 26 (evidence was sufficient to support award of attorney fees where the decree listed the parties' annual salaries and there was testimony of the initial retainer paid to wife's attorney, an approximate amount of an outstanding bill owed to the attorney, and an estimate of the amount owed to the attorney at the end of trial).

27

¶50     Bill also argues that the District Court erred by ordering him to pay Laurie the remainder of the retirement distribution paid to the Internal Revenue Service in her name. Laurie does not respond to this argument.  In December of 2009, Laurie filed a motion asking for $40,000 to pay for professional fees and costs, which the court granted.  Bill withdrew $40,000 from the parties' retirement account and, as found by the District Court, "paid Laurie only $29,600 because of the penalty and tax consequences of the withdrawal from the retirement account."  The District Court found that "Bill still owes Laurie $10,400 for her professional fees pursuant to this Court's Order.  This will be offset from additional attorney's fees assumed by Bill and/or credit for his pre-martial [sic] contributions."  Accordingly, in a finding about the 2210 Hilda property, the District Court stated that Bill would receive credit for $55,000 of premarital interest on that property, but that the "$10,400 professional fee balance owed by Bill to Laurie is offset leaving $44,600 of premarital interest."   The District Court then added up Bill's premarital interests in certain properties and awarded Bill the 1536 Reserve commercial rental property "in total as an offset against his comingled [sic] premarital interests." However, in its conclusions of law, the District Court held that "Bill shall also *pay* Laurie the $10,400 that he was previously ordered to pay her for her professional fees and costs," and ordered that payment to Laurie be made within thirty days of the Decree. (Emphasis added.)  While the record is not completely clear, it appears the District Court ordered Bill to pay this $10,400 twice, once by offset and once in cash.  However, in this large and complicated matter, $10,400 is insignificant.   Because the property and

28

maintenance determinations would not likely change, we do not deem this error to be reversible. *See Newbauer*, ¶ 20.

¶51 Finally, Laurie argues that she should have been awarded the monthly maintenance she requested, offering that "[t]he evidence at trial showed that Laurie requires maintenance of some amount." Section 40-4-203(1), MCA (2001), governs the award of spousal maintenance:

> (1) In a proceeding for dissolution of marriage . . . the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:
> (a) lacks sufficient property to provide for his reasonable needs; and
> (b) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

¶52 The District Court began by distributing the properties related to its maintenance determination:

> In order to fairly and equally divide the martial [sic] estate, each party will receive one property ("red cabin" and Hilda properties).[7] Bill shall receive the "red cabin" and Laurie shall receive the Hilda property. In order to allow Laurie to receive the Hilda property debt-free, Bill will have to refinance it. Laurie will also receive the Mary property. Given the division of property without debt, Laurie will not receive maintenance.

The District Court ordered Bill to pay child support in the amount of $1,678 per month.

¶53 The District Court further stated, "[t]he property division set forth above is sufficient to provide for Laurie's long term financial needs. Laurie earns approximately $2,500 per month ($30,000 per year) in income and will have expenses of $ 4,545.83 per

---

[7] The context for this sentence is that both parties had requested that they receive both the red cabin and the Hilda property.

month . . . . Given the real property awarded to Laurie debt-free, and the payment of her attorney's fees, maintenance is not necessary for Laurie to meet her needs."

¶54 Trial testimony indicated that the 250 Mary property yields a gross income of $12,000 to $14,400 per year. In total, the rental income from the Mary property, Laurie's salary, and the ordered child support yield a gross household income of over $62,000 per year. Laurie's projected expenses are $54,550 annually, and thus the funds which the District Court provided for her are sufficient to provide for her stated needs. *See In re Marriage of Laster*, 197 Mont. 470, 477, 643 P.2d 597, 601 (1982) (citations omitted) ("It is well established that in determining whether a spouse seeking maintenance 'lacks sufficient property' to provide for her need, 'sufficient property' means income producing, not income consuming, property."). We note that payment of Laurie's attorney fees was another consideration which entered the District Court's maintenance determination. It reasoned, "[g]iven the real property awarded to Laurie debt-free, *and the payment of her attorney's fees*, maintenance is not necessary for Laurie to meet her needs." (Emphasis added.) We conclude that the District Court did not err in refusing to award maintenance to Laurie.

¶55 Affirmed.

/S/ JIM RICE

We concur:

/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER