DA 11-0321

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 114

IN RE THE MARRIAGE OF:
DAWN ELIZABETH LEWTON,

      Petitioner and Appellee,

  and

JOHN EDWARD LEWTON,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
                     In and For the County of Silver Bow, Cause No. DR 08-145
                     Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jack H. Morris, Tranel, McCarter & Morris, PLLC; Helena, Montana

      For Appellee:

          Brad Belke, Attorney at Law; Butte, Montana

                          Submitted on Briefs:  March 21, 2012

                                     Decided:  May 29, 2012

Filed:

_____
                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellee Dawn Lewton (Dawn) filed a petition for separation in June 2008 in the Second Judicial District Court, Silver Bow County, from Appellant John Lewton (John). The petition for separation was converted to a petition for dissolution in February of 2009. Following trial in July of 2010, the District Court distributed the marital property, awarded Dawn attorney fees, and awarded Dawn back child support owed by John. John appeals and we affirm. The issues on appeal are:

¶2 *1. Did the District Court err by failing to make a finding of the net worth of the marital estate?*

¶3 *2. Did the District Court err when apportioning the marital estate?*

¶4 *3. Did the District Court err by awarding attorney fees to Dawn?*

¶5 *4. Did the District Court err by awarding maintenance to Dawn?*

¶6 *5. Did the District Court err in awarding back child support to Dawn?*

¶7 Due to the nature of the issues, we will address Issues 1 and 2 together.

## FACTUAL AND PROCEDURAL BACKGROUND

¶8 John and Dawn were married in December of 1983 and have four children. Three were adults at the time of trial, and the fourth, Evan, was 17 and turned 18 within a month after trial. Because Evan was emancipated before the decree was entered, a parenting plan is not at issue.

¶9 John is a taxidermist and Dawn is now employed as a realtor. For the majority of the marriage, Dawn was a homemaker, although the District Court found that she also

assisted with managing the couple's businesses and performed limited real estate work. The couple owned and operated several successful businesses during the marriage, related largely to John's taxidermy expertise and other skills, as follows:

a. Capehorn Taxidermy;

b. Capehorn Installations (installs landscapes to display taxidermy in homes and businesses);

c. Wildside Video (films wildlife hunts and safaris worldwide);

d. Lewton Bronzes; and

e. Boss Automotive (a car racing company that includes a collection of vintage vehicles).

¶10    The parties stipulated to the values of the following real properties they acquired during the marriage:

a. their primary residence in Cardwell, $580,000;

b. 1.2 acres of undeveloped land near Cardwell, $15,000; and

c. 298 acres of undeveloped land at Fish Creek, $298,000.

The District Court found the parties' Whitehall rental property to be worth $83,000, and valued their Whitehall taxidermy shop at $245,000, with encumbered debt of $171,000.

¶11    The court distributed the significant portion of the non-business assets to Dawn, and ordered that the Boss Automotive business and Fish Creek property be sold and the proceeds equally divided. The court distributed four businesses, the rental property, and other land to John. The court ordered John to pay Dawn $25,000 in attorney fees and

3

$26,000 in back child support for Evan's support during the pendency of the proceeding. Additional facts as necessary will be discussed herein.

**DISCUSSION**

¶12    *1. Did the District Court err by failing to make a finding of the net worth of the marital estate?  2. Did the District Court err when apportioning the marital estate?*

¶13    This Court reviews a district court's division of marital property "to determine whether the court's findings of fact are clearly erroneous and the conclusions of law are correct." *In re Marriage of Funk*, 2012 MT 14, ¶ 6, 363 Mont. 352, 270 P.3d 39.  The district court's valuation and distribution of a marital estate is a discretionary ruling that we review for abuse of discretion. *In re Marriage of Thorner*, 2008 MT 270, ¶ 21, 345 Mont. 194, 190 P.3d 1063 (citation omitted).

¶14    John argues that the District Court erred by failing to find the net worth of the parties and the marital estate, and by failing to value a number of significant assets in the estate, leading it to distribute the estate inequitably and cause substantial injustice to him. He cites *In re Marriage of Dirnberger*, 237 Mont. 398, 401, 773 P.2d 330, 332 (1989), for the proposition that "this Court has consistently held that this apportionment must be predicated upon a finding of the net worth of the marital estate. . . .  The District Court must make complete findings of fact, including assets and liabilities, from which can be established a net worth of the parties."  He asks that we reverse the District Court's findings and conclusions entirely, and remand the case for a new trial.

¶15    We explained in *In re Marriage of Walls*, 278 Mont. 413, 417, 925 P.2d 483, 485 (1996) (citations omitted), that "[g]enerally, a district court must determine the net value

4

of the marital estate at or near the time of dissolution, prior to dividing the property." However, recognizing this was not always workable, we held that "[a] net valuation by the district court therefore is not always mandatory. Rather, 'the test is whether the findings as a whole are sufficient to determine the net worth and to decide whether the distribution is equitable.'" *Walls*, 278 Mont. at 417, 925 P.2d at 485 (citations omitted). We have affirmed property distributions where the trial court did not determine an estate's net worth, when the findings with regard to the parties' assets and liabilities were sufficient to determine whether the distribution was equitable. *See In re Petition of Fenzau*, 2002 MT 197, ¶¶ 39-40, 311 Mont. 163, 54 P.3d 43; *In re Marriage of Harkin*, 2000 MT 105, ¶¶ 31-32, 299 Mont. 298, 999 P.2d 969. As we stated recently in *Funk*, "to have a proper distribution of marital assets, the district court must first determine the net worth of the parties at the time of their divorce. *Otherwise stated, the trial court must determine and consider the assets and liabilities of each of the parties.*" *Funk*, ¶ 24 (citations omitted) (emphasis added). We thus turn to the District Court's findings.

¶16    The District Court distributed to Dawn the Cardwell residence valued at $580,000 and its furnishings valued at $45,000. It assessed "any associated debt" on this property to Dawn, which she had testified was about $4,000 in back taxes. The court valued the Fish Creek land at $298,000, and ordered it to be sold and the proceeds divided equally between the parties. The court distributed to John the taxidermy shop valued at $245,000, with its corresponding debt of $171,000, the Whitehall rental property valued at $83,000, and Cardwell land valued at $15,000. The court noted that the parties'

firearms and tools had a total value between $22,000 and $120,000 based on the parties' testimony, and the court granted all of this property to John. The parties owned a variety of vehicles, including three passenger automobiles, six trucks, a dump truck, motorcycles, and four-wheelers.[1] The court awarded three passenger automobiles to Dawn and the remaining vehicles to John, with each to assume any associated debt.[2] Aside from the household furnishings, the parties had acquired artwork, African wood items, and other possessions from around the world. The court found that the parties had generally agreed on a division on most of these assets, and ordered that they be distributed as agreed. The court received testimony that Dawn owed over $32,000 on a personal loan from her parents, and that John had a balance of $8,000 on a loan consolidating the parties' credit card debt. Without expressly referencing these debts, the court ordered that "the parties shall be individually responsible for any other debts not otherwise listed in this order."

¶17 The District Court awarded John four of the businesses—Capehorn Taxidermy, Capehorn Installations, Wildside Video, and Lewton Bronzes—including all of these businesses' respective assets and liabilities. With regard to Boss Automotive, the court ordered that its vehicles, parts, and tools be sold, and that the proceeds be divided equally between John and Dawn. The court did not enter findings about the values of these

---

[1] These were primarily personal vehicles separate from the collector-model vehicles that were part of the Boss Automotive business.

[2] John filed a motion for a new trial that was based, in part, on his assertion that a skid steer distributed to him with the vehicles had previously been sold by Dawn, and that an Isuzu truck and a Dodge Sport truck distributed to him were actually owned by third parties. John appealed before the court could rule on the motion.

businesses. Regarding Boss Automotive, Dawn testified that the vehicles were worth over a million dollars. John offered the testimony of an automotive appraiser that the value of the vehicles was less than $400,000.[3] Although John is critical of the court's decision to liquidate the assets and divide the proceeds, John testified and his counsel argued that the vehicles should be sold if the parties could not come to an agreement on their value. This Court will not put a district court in error for a ruling or procedure in which the appellant participated, acquiesced, or did not object. *In re Marriage of Stevens*, 2011 MT 106, ¶ 28, 360 Mont. 344, 253 P.3d 877 (citations omitted). Further, we have held that findings can be sufficient to determine an estate's worth even though the property distribution includes a court-ordered sale of marital assets. *See In re Marriage of Hayes*, 2002 MT 281, ¶ 17, 312 Mont. 440, 60 P.3d 431 ("[U]ntil the marital properties ordered sold are sold, it is impossible to calculate the net value of the marital estate; however, the District Court's inability to calculate the exact net worth does not render its distribution of the marital estate inequitable. . . . We believe that these findings are sufficient to determine the net worth of the marital estate, given that the value of a portion of the estate is unknown and subject to the market's determination.").

¶18    We have recognized that "district courts face a considerable task in determining property valuation." *Collins v. Collins*, 2004 MT 365, ¶ 26, 324 Mont. 500, 104 P.3d 1059. Here, the District Court was faced with such a challenge in valuing the parties' businesses, given the evidence. While the parties offered their own opinion testimony

---

[3] John argues that the appraiser valued all of the vehicles, but we note the appraiser testified that he had not appraised all the collectible cars identified in evidence at trial.

about the value of the businesses, the court noted that neither party had provided the testimony of an accountant or other professional to value Capehorn Taxidermy, Capehorn Installations, and the Wildside Video businesses. The court noted the testimony of a local taxidermist that the taxidermy business was generally down 20-30%, but concluded "there is no competent evidence in relation to the businesses especially since [John] is a world famous taxidermist that has setup premier wildlife hunts and safaris over the entire world." The court reasoned that "[w]hile [John] asserts there is limited value to these businesses due to press surrounding his criminal trial, the Court finds that, in fact, [John] is internationally known for his skills in taxidermy and wildlife filming."[4] Accordingly, the court found that "[d]ue to the testimony regarding [John's] world renowned skills and that the limited information provided to the Court was based on tax returns and generalities about the taxidermy industry, the Court does not find that [John's] businesses have little to no value. In fact, [John] reported gross income of over six figures and testified that he has a significant amount of taxidermy projects sitting at the Capehorn Taxidermy building." The court found that "it has tremendous difficulty valuing the businesses together as [John] moved from project to project and neither party provided substantial evidence outside of primarily their own testimony regarding the values of the businesses collectively. . . . The Court heard considerable testimony that all of the parties' businesses' value is based primarily on [John's] reputation and skills and that;

[4] John notes that, in 2008, he was prosecuted by the state for unlawful sale of a game animal, possession of an illegally taken game animal, outfitting without a license, and violating Fish, Wildlife, and Park regulations. John was acquitted of these state charges, and other state charges were dismissed.

therefore, [John] shall be awarded all of the businesses' assets and debts including: Capehorn Taxidermy, Capehorn Installations, Wildside Video, and Lewton Bronzes." The court clearly considered testimony from the parties and witnesses, the tax returns indicating gross income, and John's reputation.

¶19 We acknowledge that some assets were distributed without valuation, such as the firearms and tools, about which the testimony offered estimates varying widely from $22,000 to $120,000. While such lack of specificity could render findings insufficient to determine whether the distribution is inequitable in some cases, *see Fenzau*, ¶ 39, we conclude it did not do so here. These personal property items were a small part of a complicated estate. The District Court determined the values of the major properties of the estate and distributed other assets pursuant to the parties' agreement. It ordered that the Fish Creek land and Boss Automotive business be sold and equally divided. Regarding the other businesses, the lack of professional financial analysis and the unique role played by John's international reputation and skills hindered an effort to accurately value them. While unable to value the businesses on this record, the District Court nonetheless concluded from tax returns that they were profitable and distributed them to John, reasoning that their value was tied to his skills and reputation. We hold that the failure of the District Court to specifically value all of the assets did not render the findings insufficient to determine whether the distribution was equitable, and that the court did not err in its valuation of the marital estate.

¶20    John argues that the court erred by failing to determine the capital gain tax liability to the marital estate triggered by the court-ordered sales of the Fish Creek land and the Boss Automotive business and vehicles. While the failure to consider a "concrete and immediate" tax liability precipitated by a property distribution order can constitute error, *Thorner*, ¶ 21, we held in *Hayes* that tax implications did not need to be addressed "[b]ecause the tax consequences of the court-ordered sale are to be borne by the marital estate and not an individual party, and because neither party offered evidence regarding those consequences." *Hayes*, ¶ 24. Similarly here, John and Dawn will both bear the tax consequences from the sale of property, and neither party presented evidence of tax liability during trial. We conclude there was no error.

¶21    Under his second issue, John argues the estate was inequitably distributed. A marital estate is distributed pursuant to § 40-4-202, MCA. *Funk*, ¶ 6. "Under this statute, a district court is vested with broad discretion to distribute the marital estate in a manner which is equitable to both parties. In dividing a marital estate, the district court must reach an equitable distribution, not necessarily an equal distribution." *Hayes*, ¶ 13 (citations omitted). "[W]e must ask whether the district court adequately considered all of the relevant facts of the particular case; whether it considered the statutory factors; and then whether it equitably distributed all property and assets accordingly." *Funk*, ¶ 15.

¶22    John argues that Dawn received over a million dollars of the marital estate, and he received only $554,000. However, John's argument fails to account for the four businesses he received, which the District Court found had the potential to yield a six

figure annual income, given John's skills and reputation. John was awarded the only other income-producing asset, the Whitehall rental home. The District Court noted the disparity in the parties' incomes, and determined to give a greater property distribution to Dawn in lieu of her request for maintenance. The District Court's findings reflect that the court adequately considered the factors of § 40-4-202, MCA, and all of the relevant facts. We conclude the distribution was equitable. *See In re Marriage of Tummarello*, 2012 MT 18, ¶¶ 28, 30, 363 Mont. 387, 270 P.3d 28.

¶23    *3. Did the District Court err by awarding attorney fees to Dawn?*

¶24    This Court reviews an award of attorney fees in a dissolution proceeding for abuse of discretion. *In re Marriage of Caras*, 2012 MT 25, ¶ 18, 364 Mont. 32, 270 P.3d 48 (citation omitted).

¶25    John argues that the District Court improperly awarded attorney fees to Dawn, contending that she was awarded sufficient assets to pay her own fees and that the court did not specifically find that John had engaged in misconduct that caused Dawn to incur additional fees. While the court's findings and conclusions do not indicate the statutory basis for awarding attorney fees, Dawn argues that the award is proper pursuant to §§ 40-4-110, MCA, and 37-61-421, MCA.

¶26    Section 40-4-110, MCA, governs the award of attorney fees in a dissolution proceeding. *Caras*, ¶ 48. That provision authorizes a fee award upon consideration of "the financial resources of both parties," for the purpose of ensuring "that both parties have timely and equitable access to marital financial resources for costs incurred" in the

11

proceeding. Section 40-4-110, MCA. We have held that attorney fees awarded pursuant to § 40-4-110, MCA, "'must be reasonable, necessary, and based on competent evidence.'" *Caras*, ¶ 48 (quoting *Harkin*, ¶ 72). Additionally, § 37-61-421, MCA, provides that "[a]n attorney or party to any court proceeding who, in the determination of the court, multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct."

¶27 The court signed a temporary order in September of 2008 adopting the parties' stipulation that "[John] will sell a 1965 Mustang and provide [Dawn] with $5,000.00 to assist her with household expenses as soon as possible." However, Dawn subsequently filed motions for contempt in December 2008, April 2009, and June 2009 related to John's refusal to pay Dawn the full $5,000 as ordered. After a hearing, the court signed an amended order in December 2009 adopting the parties' stipulation which required John to pay the remaining amount. Also, Dawn filed motions to compel John to provide discovery responses, and a motion to sanction John for his failure to provide documentation at his deposition. At trial, Dawn testified as follows:

> [Attorney]: Everything we provided today we pretty much got through our own efforts; is that correct?
> [Dawn]: Yes.
>
> . . .
>
> [Attorney]: Were [certain pieces of evidence] ever provided as a part of the formal discovery?
> [Dawn]: No.

12

[Attorney]: So all of these motions we are talking about that we had to go through for sanctions and contempt, those were necessary to get this information together?

[Dawn]: Yes.

[Attorney]: And it was a very expensive process, was it not?

[Dawn]: Yes.

[Attorney]: So in your contentions as set forth in the pretrial order and in your proposed findings you have asked the Court to require John to pay attorney's fees in the amount of $25,000; is that correct?

[Dawn]: Yes, I have.

[Attorney]: And approximately how much of that had you incurred before the start of this trial today?

[Dawn]: $21,700.

¶28 The District Court considered the parties' income, finding that Dawn had earned $37,898 in 2009, and $7,000 as of July 2010. The District Court found that, while John may have suffered some setbacks in his business due to the criminal allegations, the parties' tax returns "reflect[ed] a much different picture." The District Court noted that John had reported gross income of $232,983 in 2009, $314,972 in 2008, $646,452 in 2007, $222,864 in 2005, $233,546 in 2004, and $222,975 in 2003.

¶29 The District Court found that "[b]ased on the vast differences in income between the parties and the problems associated with discovery, the Court is awarding [Dawn] the amount of $25,000 for attorney fees." The District Court noted that the case was "tremendously cumbersome for the Court and the parties to reach trial, specifically, regarding stipulations that were not adhered to by [John] and discovery problems with [John]." While the court was "not willing to go so far as to find fraud," it nonetheless found that Dawn "has had to expend monies in order to move the case and seek compliance with previous orders." The Court concluded that "[John] did frustrate

13

stipulations between the parties as well as discovery incurring legal expenses by [Dawn] . . . .”

¶30 We conclude the District Court properly considered the parties' financial resources pursuant to § 40-4-110, MCA, and John's behavior pursuant to § 37-61-421, MCA, and did not abuse its discretion in ordering John to pay Dawn's attorney fees.[5]

¶31 *4. Did the District Court err by awarding maintenance to Dawn?*

¶32 John argues that the District Court improperly awarded maintenance to Dawn. While not entirely clear, John appears to argue this "maintenance award" took the form of an unequal property distribution. Dawn responds that the court expressly declined to award maintenance.

¶33 Dawn requested $2,500 a month in maintenance for five years, testifying that she was "not able to live on [her] own income." The court rejected Dawn's request, holding that "[b]ased on the differences in income between the parties, the parties' education and skills, and the Court's division in properties between the parties, the Court is finding that the differences in awarding of properties in this dissolution shall substitute for a specific award of maintenance." We agree with Dawn that the District Court did not award maintenance. John is, in reality, contesting the court's division of marital property rather than maintenance, and our prior discussion of Issues 1 and 2 resolves this argument.

---

[5] John very briefly argues that the court erred by not conducting a hearing or requiring that Dawn file a motion for attorney fees. However, he does not cite authority or develop his arguments, and we decline to consider them. M. R. App. P. 12(1)(f); *Fronk v. Collins*, 2011 MT 315, ¶ 10, 363 Mont. 110, 266 P.3d 1271.

14

¶34    *5. Did the District Court err in awarding back child support to Dawn?*

¶35    We review an award of child support for abuse of discretion. *Stevens*, ¶ 6 (citations omitted). "A presumption exists in favor of the district court's determination of child support and this Court will not overturn its findings unless the court abused its discretion." *In re Marriage of Haberkern*, 2004 MT 29, ¶ 31, 319 Mont. 393, 85 P.3d 743 (citation omitted). A district court may award child support retroactive to the parties' separation. *In re Marriage of Brinley*, 2010 MT 260, ¶ 8, 358 Mont. 314, 244 P.3d 339 (citations omitted).

¶36    John argues that the court erroneously awarded Dawn back child support of $26,000, an amount unsupported by the record. He argues that the court failed to give him credit for health insurance premiums he paid on behalf of Evan, and failed to impute his half of the monthly rental income which Dawn received from the Whitehall property during the proceeding.[6]

¶37    Dawn testified that she calculated John's support obligation to be $1,600 per month and that Child Support Enforcement Division (CSED) initially calculated John's support obligation for Evan to be $993 per month. Later, CSED filed a motion to intervene in the dissolution proceeding and dismiss its administrative order, indicating that after correction of an error, the support amount should be $630 per month.

---

[6] John fails to cite and argue from our cases addressing the payment of health insurance costs for purposes of child support determinations. *See e.g. Stevens*, ¶ 18; *In re Marriage of Frick*, 2011 MT 41, ¶ 40, 359 Mont. 296, 249 P.3d 67.

15

¶38    Dawn also testified that John had not paid "any child support" during "the pendency of this matter," and the District Court found that John "did not really contest [Dawn's] assertions but primarily argued that he paid health insurance premiums and other monthly debts." It noted the arrearage ranged from $16,000 to $42,000. Before the court were the above-stated calculations of monthly support, and John's position that he had made other contributions. Noting the information was limited, the court set the amount at $26,000. We conclude that the award was supported by substantial evidence and did not constitute an abuse of discretion.

¶39    Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

16